[No. B106120. Second Dist., Div. Four. Apr. 22, 1997.]

STATE FARM FIRE AND CASUALTY COMPANY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
RODERICK TAYLOR et al., Real Parties in Interest.

## COUNSEL

Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone, Anthony E. Shafton, G. Arthur Meneses, Robie & Matthai, James R. Robie and Pamela E. Dunn for Petitioners.

No appearance for Respondent.

Kick & Bernheim, Daniel O'Leary and Bernie Bernheim for Real Parties in Interest.

Latham & Watkins and Barbara A. Caulfield as Amici Curiae.

## OPINION

**HASTINGS, J.**—At issue in this case is "the preservation of public trust in the scrupulous administration of justice and the integrity of the bar." (*In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 586 [283 Cal.Rptr. 732].)

The subject of this proceeding is an order of the trial court granting disclosure of information, some of which falls within the attorney-client and work product privileges, developed by the defense during litigation. We conclude that substantial evidence supports a finding of a prima facie case establishing the crime/fraud exception to the attorney-client privilege and that the same evidence establishes good cause for disclosure of work product and trade secret information. We therefore deny the petition for writ of mandate filed by State Farm Fire and Casualty Company (State Farm).

## STATEMENT OF FACTS

On September 21, 1995, real parties in interest, Roderick and Krista Taylor, filed suit against State Farm, several insurance brokers and current and former State Farm agents (the Taylor Action). In their second amended complaint, real parties allege that in 1983, State Farm, through its agent Harry Gelpar, issued a homeowners insurance policy to them, which they believed contained earthquake coverage for their Sherman Oaks residence. The policy was annually renewed and remained in force through the filing of the action. In 1990, real parties asked their insurance brokers, Cass, Roden and E. Broox Randall & Sons, to prepare a schedule of insurance coverage for their properties. The schedule, dated November 1, 1990, stated that earthquake coverage existed for their Sherman Oaks residence. After their real property had been significantly damaged in the January 17, 1994, Northridge earthquake, real parties filed a claim with State Farm. State Farm denied the claim on the basis that the policy did not include earthquake coverage. Real parties allege that State Farm and its agents participated in fraudulent misrepresentation regarding the coverage afforded. In addition, it is alleged that State Farm did not comply with Insurance Code section 10081 et seq. which requires that the company notify insureds that they do not have earthquake coverage and offer to sell it to them.[1] Real parties seek damages against State Farm based upon breach of contract, negligent misrepresentation, negligence, negligence per se and common law and statutory bad faith theories.

---

[1] The pertinent portions of the Insurance Code, as applicable on the dates in question, provide as follows: "No policy of residential property insurance may be issued or delivered or, with respect to policies in effect on the effective date of this chapter, initially renewed in this state by any insurer unless the named insured is offered coverage for loss or damage caused by the peril of earthquake as provided in this chapter." (§ 10081.) "(a) The offer of coverage required by Section 10081 may be made prior to, concurrent with, or within 60 days following the issuance or renewal of a residential property insurance policy." (§ 10083.) "If the insurer establishes proof of mailing or delivery of the required offer and the offer of earthquake coverage is not accepted by the named insured within 30 days from the date of mailing or delivery of the offer, there shall be a conclusive presumption that the named insured elected not to accept the coverage." (§ 10085.) "If an offer of earthquake coverage is accepted, the coverage shall be continued at the applicable rates and conditions, provided the policy of residential property insurance is not terminated by the named insured or insurer." (§ 10086.) "Where the offer of earthquake coverage has not been accepted, the insurer shall notify the named insured that the policy does not provide that coverage." (§ 10086.1.)

State Farm retained the law firm of Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone (the Berger Firm) to defend it in the Taylor Action.

At the time the action was filed, Amy Girod Zuniga was employed by State Farm as a claims specialist in the "Suits Against the Company" unit, later renamed the "Litigation Unit." Her unit was utilized as the contact within the company through which State Farm's outside attorneys could communicate with the company regarding suits against the company. Her responsibilities included evaluating bad faith claims against State Farm, responding to discovery in those actions, monitoring the litigation, and advising the company and outside counsel which witnesses from State Farm would be appropriate for testimony at trial or in depositions. She was assigned these duties in connection with the Taylor Action. In this capacity she communicated with outside counsel and other State Farm employees, aided outside counsel in gathering the necessary documentation to respond to discovery, and personally verified over 20 sets of discovery responses.

Extensive discovery was undertaken. Real parties served a number of requests to produce documents on State Farm. Among the items sought were documents reflecting State Farm practices in handling applications for issuance of insurance, manuals and documents instructing how claims were to be handled, and documents which evidenced how State Farm complied with Insurance Code sections 10083 and 10086.1 notice requirements. Interrogatories were served requesting information on the same subjects. State Farm interposed numerous objections to these discovery requests but did provide some of the information requested.

Because Amy Zuniga had verified responses to various items of discovery, real parties took her deposition. The questions focused on her role at State Farm in gathering information to respond to the various items of discovery. During the deposition, which was taken before a discovery referee, State Farm interposed numerous objections to questions it believed infringed upon the attorney-client and work product privileges. The referee instructed counsel for real parties and the witness to avoid privileged subjects, although Ms. Zuniga was directed to answer questions eliciting factual information.

Real parties also noticed the deposition of the person at State Farm "most qualified on the subject of the reasons why [real parties'] claim for coverage for losses arising out of the January 17, 1994 earthquake was denied. . . ." That person was requested to produce documents at the deposition, including the following: "13. The State Farm . . . claims manual as it existed on the date the [real parties] made their claim for damages to the PROPERTY arising

out of the January 17, 1994 Northridge earthquake. [¶] 14. ALL DOCUMENTS evidencing, in whole or in part, State Farm's policies and procedures for handling residential damage claims relating to the January 17, 1994 Northridge earthquake, including but not limited to bulletins, memoranda, manuals, and portions of manuals." State Farm designated Karen Nicholson as the person to be deposed and objected to production of the documents requested. Her deposition was also conducted before the discovery referee, who ordered that the referenced documents be produced at the next session of Ms. Nicholson's deposition. They were not produced; instead, she testified that no such documents existed.

Ms. Nicholson identified Toni Hotzel as the State Farm claims specialist who had investigated and denied the claim of real parties. Ms. Hotzel's deposition was noticed and taken. During the second portion of her deposition she was evasive and failed to confirm whether she had signed and sent two letters, one of which notified real parties that their claim was denied. She also failed to authenticate a tape recording she made during her investigation of the claim.[2]

---

[2]The following are excerpts from Ms. Hotzel's deposition testimony: "MR. BERNHEIM [counsel for real parties]: Q. Did you send this here dated—March 21, 1994, to Jeffrey Roden? [¶] A. I don't know if I did or not. [¶] Q. Is that your signature at the bottom of the letter? [¶] A. I don't know. It might or might not be. [¶] Q. Does it resemble your signature? [¶] A. Oh, goodness. Umm—I write my name a lot of different ways. I don't know if it can resemble it or not. [¶] Q. Can you read what it says in cursive handwriting under the typed words 'Toni Hotzel'? Or above the typed words 'Toni Hotzel'? [¶] A. I'm not sure. [¶] . . . [¶] Q. Can you read what that says? [¶] A. Hmm. I don't know. Could be many things. I don't know. [¶] . . . [¶] Looks more like 'hotel' in the last word. I don't know."
Mr. Bernheim then produced a letter dated May 22, 1994, and inquired of the witness: "Q. Ms. Hotzel, have you now had an opportunity to review the document, the May 22nd letter? [¶] A. Yes, I have reviewed the document. [¶] Q. Does your signature appear anywhere on that letter? [¶] A. I don't know if it does or does not. [¶] Q. Okay. I direct your attention to the cursive handwriting under the word 'sincerely.' Is that your signature where it says 'Toni Hotzel' . . . ? [¶] A. I don't know if it is or is not. [¶] Q. You do not recognize that as your signature? [¶] A. Half of the letters are gone, even. No, I don't recognize if it's my signature or not. [¶] Q. Have your ever seen the original of this May 22nd letter from Toni Hotzel to Roderick and Krista Taylor? [¶] A. I have seen the original where? [¶] Q. Have you ever seen it? [¶] A. I don't know. [¶] Q. Did you draft this letter? [¶] A. I don't know if I drafted it or not. [¶] Q. Did you send this letter? [¶] A. Umm— [¶] Q. To the Taylors. [¶] A. I don't know if I did or did not."
Later, the tape recording was played and the following transpired: "(Mr. Bernheim starts tape.) [¶] FIRST VOICE: This is Toni Hotzel talking to Jeff Roden by phone. It is May 9th, approximately 1:05 in the afternoon. We are talking about our insured[s] . . . Roderick and Krista Taylor. [¶] [Thereafter the transcript reports the content of the tape which ended with the following exchange.] [¶] FIRST VOICE: It's now about 1:14. Can I have your name again, please? [¶] SECOND VOICE: Sure. It's Jeffrey Roden, R-o-d-e-n. [¶] FIRST VOICE: And this is Toni Hotzel. Thank you very much. [¶] BY MR. BERNHEIM: Q. Miss Hotzel, did you hear the female voice on the tape recording that just identified herself as Toni Hotzel? [¶] A. Can I

On July 19, 1996, State Farm filed a motion for summary judgment. It presented evidence to establish that it had no involvement in the 1990 broker prepared schedule of insurance and argued that it was not responsible for any misrepresentations that real parties were covered for earthquake damage. Additionally, it presented evidence that it had satisfied its statutory duties to mail earthquake offers and notices to real parties. In support of the latter point it presented evidence that it used an automatic insertion machine to comply with all notices required by the Insurance Code. The evidence was presented through the declarations of Richard Churik, operator of the automatic insertion machine, and Charles G. Hook.

In opposition, real parties sought to file a third amended complaint. They alleged that State Farm's agent, Harry Gelpar, or his employee, forged real parties' signatures on the original of their application for insurance. In connection with this argument they presented the declaration of a handwriting expert who opined that the signature purporting to be that of Rod Taylor was not his signature. However, discovery was still ongoing and he requested further exemplars of handwriting in support of his opinion. The third amended complaint also alleged that State Farm had destroyed evidence relating to the initial issuance of the policy and of claims procedures and policies in connection with handling of earthquake claims and, more particularly, real parties' claim.

Real parties made similar assertions in opposition to the motion for summary judgment. They asserted that State Farm had not kept the original copy of their application for insurance and other connected papers. They also presented the declaration of Samantha Bird, a past employee of State Farm, who stated that in 1990 the company adopted a policy of destroying documents which might be discoverable in litigation against it: "The memorandum I wrote instructed my claims personnel to destroy documents so they could not be used against the Company in bad faith litigation. . . . [I]n writing this memorandum, and in directing my claims personnel to destroy

---

have the question again, please? [¶] THE COURT: Did you hear the voice on the tape? [¶] THE WITNESS: I heard two voices, I believe. [¶] THE COURT: Did you hear the one that appeared to be—that sounded like it was female? [¶] THE WITNESS: I heard one that could sound like it would be female, yes. [¶] THE COURT: Mr. Bernheim. [¶] BY MR. BERNHEIM: Q. Did you hear that one that could sound like it was female identify herself as Toni Hotzel? [¶] A. Can I have the question again, please? [¶] THE COURT: Did you hear the female voice on the tape identify herself as Toni Hotzel? [¶] THE WITNESS: Yes, I did. [¶] BY MR. BERNHEIM: Q. Was that you? [¶] A. I don't know. [¶] Q. Did you recognize your own voice? [¶] A. (No audible response). [¶] Q. On this tape? [¶] . . . [¶] A. Oh, I don't know if it's my voice or not. I don't know how I sound to other people. I don't know."

potential evidence against us, I was at all times following the instructions of my superiors at the Company."[3]

Real parties also contended that State Farm was manufacturing evidence. They provided the declaration of Linda Crisafulli, a business manager for real parties, who questioned the authenticity of the declarations page filed in connection with the motion for summary judgment to prove that earthquake coverage was not afforded to real parties. She pointed out that the declarations page identified the Small Business Administration as a mortgagee on the Sherman Oaks property, a curious listing because it was only after the earthquake that real parties had obtained a loan from the Small Business Administration.

The court took the motions under submission, and on August 28 it denied the motion to amend and granted State Farm's motion for summary judgment.

Real parties moved for reconsideration of both motions. In support of their request, they attached two declarations from Amy Zuniga, by then an ex-employee of State Farm. She identified her background with State Farm and the fact that she had worked on the Taylor Action while employed by State Farm. She declared that State Farm had not been fully compliant in responding to discovery requests in the Taylor Action; she disclosed in-house litigation strategy in connection with document disclosure and witness preparation; and she reiterated conversations with other State Farm employees and inside and outside counsel relating to discovery and litigation

---

[3]Attached to the declaration were two documents. First was the minutes of a staff meeting of April 5, 1990, which stated in part: "We were instructed to destroy old memo's [sic], claim school notes, old procedures, old P & S manuals, etc. The reasoning behind this is that we do not keep discoverable information that could be asked for in 'bad faith' suits. It was emphasized that we purge information that is older than 6 months. Seldom do we refer to this old information anyway." The second item was a memorandum dated April 6, 1990, which states as follows: "Yesterday in the staff meeting, we talked about the need to purge our desks of all old memo's [sic], notes and procedural guides. With the increase of bad faith suits being filed against State Farm, it is important that you get rid of all your old stuff I know you have lurking around in your drawers and filing cabinets. [¶] Please get rid of any old memo's [sic], claim school notes, old seminar or claim conference notes, and any old procedure guides you may have. They are trying to avoid having to come up with old records when the 'request for production of documents' comes in and they request 'all training manuals, memo's [sic], procedural guides, etc., that are in the possession of your claim reps and management'. Apparently they had a request like this in Texas and each person had to surrender all their old junk. I guess corporate is not even going to keep old CPG guides, old claim manuals, etc. *We will only have what is currently in effect. That way if they subpoena our claim manual for U claims for 1987, for example, we will say we don't have it. This should be easier than trying to produce it or having to defend it.* [¶] So, look through all your old stuff and dump it. You won't ever miss it." (Italics added.)

strategy. One of these conversations was with Richard Churik, operator of the automatic insertion machine, during which he allegedly raised questions about the reliability of the machine.

State Farm's counsel immediately initiated a conference call to the trial court, asserted that the information contained within Ms. Zuniga's declarations was privileged and requested a protective order. The court refused to issue the order over the telephone but invited counsel to chambers the next morning to discuss the matter.

The next morning, October 3, the parties appeared and State Farm requested a protective order sealing Ms. Zuniga's declarations and prohibiting real parties' counsel from disseminating any information he had learned from Ms. Zuniga. It also sought to preclude counsel from making further inquiries of Ms. Zuniga on the same issues and requested an order sealing all documents filed in connection with the hearings. The court granted the requests pending further hearings. Over the next few days the parties filed documents in support of and in opposition to the requested protective orders. On October 8, all parties were again before the court.

Real parties took the position that State Farm was guilty of fraud in the original issuance of the policy and that it was perpetuating the fraud by the manner in which it was conducting its defense of the Taylor Action. They asserted that the crime/fraud exception precluded application of the attorney-client privilege. In support of this argument, real parties referenced the evasive deposition testimony of Toni Hotzel and the failure of Ms. Nicholson to produce claims manuals at her deposition, despite being ordered to do so by the referee. They referred to portions of Ms. Zuniga's declarations and argued that State Farm has a company policy of preparing witnesses to be evasive during depositions and that Ms. Nicholson did have documents in her possession responsive to the document request, proving that Ms. Nicholson lied at her deposition. Real parties also provided documentation from other State Farm litigation and their counsel argued that this case was not an isolated incident: "And—you know, before I go any further, though, into what that is and what the evidence of State Farm's global conduct is in this regard—not just in our case, but in *Martin versus State Farm* and *Singh versus State Farm*, in *Campbell versus State Farm*, in Utah and a lot of other cases—this has to start coming out. The—the judicial branch has to put a stop to it." Real parties also urged that much of the information within Ms. Zuniga's declarations was factual material not protected by any asserted privilege.

State Farm took the position that all of its conduct during discovery was appropriate and that most of what Ms. Zuniga declared merely demonstrated

a misunderstanding of what had occurred during discovery. It asserted that everything Ms. Zuniga knew was learned as an employee within the suits against company unit and should be protected.

The court noted that it had read every line of each of the Zuniga declarations, had analyzed the declarations, and was familiar with the underlying discovery issues raised by real parties, including the Hotzel deposition. The matter was submitted and later that same day the court vacated the temporary protective order and ordered all of the documents unsealed.

The next day, State Farm requested a temporary stay of the order pending appellate review. The request was denied. State Farm petitioned this court for a writ of mandate or prohibition. Because at least some of the information ordered released is privileged material, we issued a temporary stay, requested preliminary opposition, and ultimately issued an alternative writ. (*Roberts* v. *Superior Court* (1973) 9 Cal.3d 330, 336 [107 Cal.Rptr. 309, 508 P.2d 309]; *BP Alaska Exploration, Inc.* v. *Superior Court* (1988) 199 Cal.App.3d 1240, 1249 [245 Cal.Rptr. 682].) We now turn to the merits of the claims.

## DISCUSSION

First, before we turn to a discussion of the various privileges, we note that this matter is before us solely on the issue of the protective order sought in the trial court. State Farm requested that the court issue an order "precluding Plaintiffs' counsel, their agents and employees: [¶] (1) from disseminating to any third parties any information protected by the attorney-client privilege, the attorney work product doctrine or trade secret laws that plaintiffs' counsel learned or otherwise obtained from Amy Zuniga; [¶] (2) from inquiring further of Amy Zuniga about any matters protected by the attorney-client privilege, the attorney work product doctrine, or trade secret laws; and [¶] (3) from filing any documents in this Court relating to protected information obtained from Amy Zuniga, except under seal."

Next, we must comment upon an argument made by State Farm to the trial court, and suggested in its argument before us: that because Ms. Zuniga worked exclusively within the suits against company unit, everything she learned about State Farm is privileged from disclosure. The argument was presented to the trial court as follows: "Amy Zuniga's entire responsibility while working in the Suits Against the Company ('SAC') unit was to interface between attorneys and the rest of State Farm Fire & Casualty Co. Her duties involved collecting information from attorneys to convey to higher-ups at State Farm, and collecting information from employees of

State Farm to convey to the attorneys. She had no duties other than to support the attorneys who were representing State Farm, and advise State Farm of what the attorneys were doing and recommending. [¶] In her role, there was nothing which Zuniga learned which was not directly part of an attorney-client communication. . . . [¶] *Thus, everything which Ms. Zuniga learned during her career in SAC was attorney client communication* (in that she procured the information at the request of an attorney for the purpose of conveying to the attorney) *or attorney work product* (as it was part of a discussion of the attorney's impressions, conclusions, opinions, or legal research, or theories.) Accordingly, the Protective Order should be granted, and the Declarations should be stricken *in their entirety*." (Italics added.)

While the evidence supports a conclusion that much, if not all, of the factual information Ms. Zuniga retains relating to her employment was learned while involved in litigation matters with State Farm, we cannot conclude that this precludes disclosure of relevant, nonprivileged, information she may have. State Farm cites to no authority establishing any such policy. An admonition within Weil and Brown, California Practice Guide: Civil Procedure Before Trial 1 (The Rutter Group 1996) paragraph 1:589, page 1-124, appears on point here: "In most actions against an organization, its former officers and employees are the *best available source of information* to opposing counsel. If willing to cooperate, they may provide information otherwise shielded from discovery under privacy or attorney-client privilege!"

## THE ZUNIGA DECLARATIONS

### *The Attorney-client Privilege*

"Subject to Section 912 and except as otherwise provided in this article, the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer if the privilege is claimed by: [¶] (a) The holder of the privilege; [¶] (b) A person who is authorized to claim the privilege by the holder of the privilege; or [¶] (c) The person who was the lawyer at the time of the confidential communication, but such person may not claim the privilege if there is no holder of the privilege in existence or if he is otherwise instructed by a person authorized to permit disclosure." (Evid. Code, § 954.)

"As used in this article, 'client' means a person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing the legal service or advice from him in his professional capacity . . . ." (Evid. Code, § 951.)

■ When a party asserts the attorney-client privilege it is incumbent upon that party to prove the preliminary fact that a privilege exists. (*Mahoney* v. *Superior Court* (1983) 142 Cal.App.3d 937, 940 [191 Cal.Rptr. 425].) Once the foundational facts have been presented, i.e., that a communication has been made "in confidence in the course of the lawyer-client . . . relationship, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential," or that an exception exists. (Evid. Code, § 917; *BP Alaska Exploration, Inc.* v. *Superior Court, supra,* 199 Cal.App.3d at p. 1262.)

■ We have no doubt that Ms. Zuniga was an "authorized representative" of State Farm within the meaning of Evidence Code section 951 for application of the privilege. ■ "It is no less the client's communication to the attorney when it is given by the client to an agent for transmission to the attorney, and it is immaterial whether the agent is the agent of the attorney, the client, or both." (*City & County of S.F.* v. *Superior Court* (1951) 37 Cal.2d 227, 236 [231 P.2d 26, 25 A.L.R.2d 1418]; see also *People* v. *Lines* (1975) 13 Cal.3d 500 [119 Cal.Rptr. 225, 531 P.2d 793]; and *In re Ochse* (1951) 38 Cal.2d 230, 232 [238 P.2d 561].) ■ However, the attorney-client privilege only protects disclosure of *communications* between the attorney and the client; it does not protect disclosure of underlying facts which may be referenced within a qualifying communication. (*Aerojet-General Corp.* v. *Transport Indemnity Insurance* (1993) 18 Cal.App.4th 996, 1004-1005 [22 Cal.Rptr.2d 862].)

Therefore, to the extent that Ms. Zuniga has knowledge about the practices and procedures of State Farm, or the existence of claims manuals and other documents which are normally utilized by State Farm in the operation of its business, the information is not privileged. (*Holm* v. *Superior Court* (1954) 42 Cal.2d 500, 511 [267 P.2d 1025], disapproved on another point in *Suezaki* v. *Superior Court* (1962) 58 Cal.2d 166, 176 [23 Cal.Rptr. 368, 373 P.2d 432, 95 A.L.R.2d 1073]; *S.F. Unified Sch. Dist.* v. *Superior Court* (1961) 55 Cal.2d 451, 457 [11 Cal.Rptr. 373, 359 P.2d 925, 82 A.L.R.2d 1156].) Also, it would not be a violation of the attorney-client privilege for Ms. Zuniga to divulge that such documents exist but were not produced in connection with the Taylor Action, although to divulge a conversation to that effect or the fact that such information had been delivered to an attorney, would violate the privilege. (*People* v. *Lee* (1970) 3 Cal.App.3d 514, 526 [83 Cal.Rptr. 715] [". . . the fact that the client delivered . . . evidence to his attorney may be privileged, the physical object [or information] itself does not become privileged merely by reason of its transmission to the attorney."].)

Nor does the attorney-client privilege protect independent facts related to a communication; that a communication took place, and the time, date and participants in the communication. (*Coy* v. *Superior Court* (1962) 58 Cal.2d 210, 219-220 [23 Cal.Rptr. 393, 373 P.2d 457, 9 A.L.R.3d 678].) In addition, the fact that an attorney has retained one or more independent agents to aid the attorney in connection with the litigation does not automatically qualify information discovered by the agents for protection by the privilege. (*People* ex rel. *Dept. of Public Works* v. *Donovan* (1962) 57 Cal.2d 346, 354-355 [19 Cal.Rptr. 473, 369 P.2d 1]; *People* ex rel. *Dept. Pub. Wks.* v. *Cowan* (1969) 1 Cal.App.3d 1001, 1004 [81 Cal.Rptr. 713]; *Grand Lake Drive In* v. *Superior Court* (1960) 179 Cal.App.2d 122, 125-126 [3 Cal.Rptr. 621].)

■ With the foregoing legal principles in mind, we now review the specific items asserted to fall within the attorney-client privilege, along with the evidence presented by State Farm, to determine whether a prima facie case of privilege has been established. We will not take into consideration the actual privileged information in aid of our determination. (Evid. Code, § 915; *Shannon* v. *Superior Court* (1990) 217 Cal.App.3d 986, 995 [266 Cal.Rptr. 242].) To the extent necessary, we will identify the subject matter covered in each of the challenged paragraphs, but without disclosing the privileged communication. (*Coy* v. *Superior Court, supra*, 58 Cal.2d at p. 219.)

State Farm asserts the attorney-client privilege to paragraphs 3 and 4 of the September 19 Zuniga declaration and to numerous paragraphs of her September 25 declaration, which we will identify in the following discussion.

In paragraph 3 and 4 of the September 19 declaration and paragraphs 14, 15, 18, and 23 of the September 25 declaration, Ms. Zuniga references conversations with various people within State Farm. State Farm objects to each paragraph to the extent that counsel may have been present during the conversation or that the conversations were at the direction of counsel to pass on legal advice. For example, with regard to paragraph 3 of the September 19 declaration, Amy Zuniga declares that she received instructions "not to provide certain relevant information at my depositions." (See *post*, p. 648.) State Farm argued: "it is impossible to determine who 'instructed' Zuniga concerning her deposition testimony. *It is likely that any such 'instruction' was made by State Farm's counsel.* As such, the communication is privileged." (Italics added.) The objections to the other paragraphs are of a similar nature.

As previously noted, it is the duty of the party asserting the privilege to present evidence which establishes the existence of a communication

that falls within the privilege. (*Mahoney* v. *Superior Court, supra,* 142 Cal.App.3d at p. 940.) In connection with the request for protective order, and in reply to the memorandum of authorities submitted by real parties, State Farm presented the declarations of Vanessa Gudelj and John Poptanich, each a supervisor of Amy Zuniga. G. Arthur Meneses, an attorney within the Berger Firm who had the primary responsibility for working with Ms. Zuniga, also provided two declarations. Mr. Meneses declared that he worked with Ms. Zuniga in preparation for her deposition, but that he did not advise her "to conceal relevant, non-privileged, discoverable information at her deposition or at any other time." Ms. Gudelj declared that she spoke with Ms. Zuniga prior to her deposition and gave her instructions on how to respond, but she does not state that she did so at the request of counsel. Mr. Poptanich also fails to establish that any conversations referenced in any of the subject paragraphs were at the direction of counsel. Therefore, State Farm has failed to demonstrate that any of these referenced communications fall within the attorney-client privilege.

Paragraph 5[4] refers to statements made to Ms. Zuniga by Richard Churik, the operator of the automatic insertion machine, "and others" at State Farm. State Farm fails to supply any information which would place the asserted communications within the scope of attorney-client privilege.

Paragraphs 6, 7, 9 and 10 refer to inspections Ms. Zuniga made of the automatic insertion machine system (the AIM system) with Richard Churik, underwriter Charles G. Hook, Attorney G. Arthur Meneses of the Berger Firm, and a consultant by the name of Don Winslow. No specific communications are referenced in paragraph 6, only factual information that meetings took place, the subject matter of the meetings, and who was present. Therefore, the information is not privileged. (*Coy* v. *Superior Court, supra,* 58 Cal.2d at pp. 219-220.) Paragraphs 7, 9 and 10 recount observations by Ms. Zuniga and conversations in the presence of Mr. Meneses during the inspections referred to in paragraph 6. This presumptively brings the *conversations* within the attorney-client privilege. (*City & County of S.F.* v. *Superior Court, supra,* 37 Cal.2d at p. 236.) However, Ms. Zuniga's *observations*, independent of the conversations, would not be privileged.

Paragraph 11 reiterates a statement made by Ms. Zuniga to Mr. Meneses regarding her individual experience as a State Farm policyholder, to which he did not reply. It is apparent from the context that she was attempting to pass on information to him relevant to the Taylor Action. Therefore, this conversation would be privileged, but her independent knowledge learned as a policyholder of State Farm would not be. (*Aerojet-General Corp.* v. *Transport Indemnity Insurance, supra,* 18 Cal.App.4th at pp. 1004-1005.)

---

[4]The remaining paragraphs are all contained within the September 25 declaration.

Paragraph 12 references a conversation between Mr. Meneses and Ms. Zuniga regarding the discovery of documents in connection with the automatic insertion machine. The first two sentences of the paragraph are not privileged because they merely relate factual information. (*Aerojet-General Corp.* v. *Transport Indemnity Insurance, supra,* 18 Cal.App.4th at pp. 1004-1005.) A portion of the paragraph reiterates information obtained by Ms. Zuniga from the operator of the automatic insertion machine, Richard Churik. It appears from the context that Ms. Zuniga obtained this information in order to pass it on to Mr. Meneses; therefore the communication would be privileged. (*City & County of S.F.* v. *Superior Court, supra,* 37 Cal.2d at p. 236.)

The last phrase within paragraph 16 contains a comment from Mr. Meneses about a telephone conversation between Ms. Zuniga and State Farm employees John Bishop, Sandra Hobbs, Vanessa Gudelj and John Poptanich, which occurred in 1996. Mr. Meneses was not a party to the call. What was said between Mr. Meneses and Ms. Zuniga about the conversation is privileged. However, the remainder of the paragraph is not privileged because it merely sets out factually that a conversation occurred and among whom. (*Coy* v. *Superior Court, supra,* 58 Cal.2d at pp. 219-220.)

Paragraph 17 reports the conversation referenced in paragraph 16. State Farm again relies upon the argument that the conversation *may have* occurred "at the request of counsel" or "Mr. Bishop was communicating to his subordinates legal advice of counsel. . . ." No evidence is presented to support this speculation.

Paragraph 22 describes a conversation with David Tannenbaum, a company employee in the "Discovery Unit," about how Ms. Zuniga was to respond to discovery in earthquake cases. State Farm presents evidence that Mr. Tannenbaum is an in-house attorney who works on discovery matters in pending litigation cases. This establishes a presumption that the communication is privileged.

Paragraph 24 references memoranda Ms. Zuniga prepared in connection with the discovery requests. The first sentence, identifying the fact that she prepared memoranda, is not privileged. However, the second sentence is. (*People* v. *Lee, supra,* 3 Cal.App.3d at p. 526.)

The last sentence of paragraph 25 indicates that Ms. Zuniga spoke with Mr. Meneses, again with regard to specific discovery requests relating to the automatic insertion machine. All but the last sentence is factual material about what items were requested during discovery but not produced. That

portion is not privileged. We agree that the last sentence of the paragraph falls within the attorney-client privilege.

Paragraphs 31 and 32 set forth facts about the retention of "professional witness consultants" and how they are utilized by State Farm to prepare employees for testimony during depositions and trial. State Farm objects that "the conversations between counsel for State Farm's consultants and State Farm employees constitute confidential communications made in the course of the attorney-client relationship." Mr. Meneses declares: "To the extent Ms. Zuniga participated in witness preparation meetings, the only persons present were myself, a consultant (if retained) the witness, and a member or members of the suits against the company unit. . . . The consultants she mentions in paragraph 31 in the past have been retained by my firm in connection with litigation in which I was representing various clients on different cases. To the extent these consultants were retained, they were retained for my benefit to assist me in my representation of my client." At least some of this information discloses communications which appear to have arisen in a privileged setting.

Paragraph 33 references communications between Don Winslow and Charles Hook in preparation for Hook's deposition. There is no evidence presented which suggests that these communications took place with counsel present or at the request of counsel for State Farm, although Mr. Winslow has been described in the documentation as a consultant retained by counsel for State Farm. We will assume that this item is privileged.

In summary, we conclude that portions of paragraphs 7, 9, 10, 11, 12, 16, 24 and 25, and all of paragraphs 22 and 31-33, fall within the attorney-client privilege. The remainder do not so qualify.

*The Crime/Fraud Exception*

Evidence Code section 956 is the so-called crime/fraud exception: "There is no privilege under this article if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud."

"To invoke the Evidence Code section 956 exception to the attorney-client privilege, the proponent must make a prima facie showing that the services of the lawyer 'were sought or obtained' to enable or to aid anyone to commit or plan to commit a crime or fraud. [Citation.]" (*BP Alaska Exploration, Inc.* v. *Superior Court, supra,* 199 Cal.App.3d at p. 1262.) One application of this exception is illustrated by the facts in *BP Alaska.*

Nahama & Weagant Company (NWEC) approached BP Alaska Exploration, Inc. (BPAE) with a proposal that they join a large scale oil exploration venture on land controlled by Tenneco Oil Company. In connection with the offer, NWEC delivered what it contended was confidential information about the project. Ultimately, BPAE declined to join with NWEC but did form an agreement with Tenneco directly. NWEC wrote to BPAE seeking an explanation of BPAE's exclusion of NWEC from the exploration agreement. Because of the *threat* of litigation, BPAE asked its in-house counsel and outside counsel to assist in an investigation to be able to respond to the letter from NWEC. During the investigation, outside counsel and in-house counsel each provided reports to BPAE which were utilized in forming a reply to NWEC. Ultimately, NWEC filed suit against BPAE and sought discovery from BPAE about its investigation of NWEC's claim, including the reports and communications between BPAE and its in-house and outside counsel. It was argued that these communications were utilized in framing the letter ultimately sent to NWEC which was alleged to contain misrepresentations. (199 Cal.App.3d at pp. 1247-1249.) The Court of Appeal concluded "that NWEC made a prima facie showing that BPAE sought its attorney's services to assist in the commission or planning of a fraud by making misrepresentations of fact aimed at discouraging NWEC from pursuing its claims." (*Id.* at p. 1269.)

Here, contrary to the facts in *BP Alaska*, there is no evidence in the record that State Farm retained the services of the Berger Firm in connection with the underlying subject matter of the Taylor Action, the claimed fraud in issuance of the policy. Instead, the record reflects that the Berger Firm was only retained to defend State Farm after it was sued by the Taylors. On its face, this falls within the traditional application of the attorney-client privilege in a litigation setting; the client has already committed an alleged crime or a civil fraud and retains the attorney to provide a defense to the action. The information exchanged between the attorney and the client is totally privileged, even if the client confesses the wrongdoing to the attorney.

Real parties argue that wrongful tactics utilized by State Farm in *defending* the litigation fall within the exception because they continue the original fraud, which forms the basis of the suit, and also constitute a fraud upon the court. They contend that the actions of State Farm violate a number of criminal statutes: Penal Code sections 118 (perjury); 127 (subornation of perjury); 132 (offering forged or altered documents); 134 (preparing false documentary evidence); and 135 (destroying or concealing documentary evidence).

We believe that extreme caution must be exercised when an accusation is made which will invade the attorney-client relationship in connection with

ongoing litigation. Such consideration was afforded in the cases of *People* v. *Superior Court* (*Bauman & Rose*) (1995) 37 Cal.App.4th 1757 [44 Cal.Rptr.2d 734] and *Geilim* v. *Superior Court* (1991) 234 Cal.App.3d 166 [285 Cal.Rptr. 602]. Both cases arose after a search warrant was issued pursuant to the provisions of Penal Code section 1524, subdivision (c), and client files were seized from attorneys' offices on the basis of probable cause to establish insurance fraud. Both cases concluded that the showing of probable cause to issue a search warrant did not rise to the level of a prima facie showing to establish the crime/fraud exception. They each concluded that a further in camera hearing was appropriate to determine whether a prima facie showing existed to apply the exception. (*People* v. *Superior Court* (*Bauman & Rose*), *supra*, 37 Cal.App.4th at pp. 1768-1769.)

Penal Code section 1524 is one of the enumerated exceptions to Evidence Code section 915 authorizing the court to utilize an in camera hearing in order to rule on the claim of privilege. The other two enumerated exceptions are Evidence Code sections 1040 (official information and identity of informer) and 1060 (trade secret). From these enumerated exceptions to Evidence Code section 915, we conclude that the Legislature does not contemplate disclosure of privileged material in ruling on the crime/fraud exception. (*United Farm Workers of America* v. *Agricultural Labor Relations Bd.* (1995) 41 Cal.App.4th 303, 316 [48 Cal.Rptr.2d 696].) However, section 915 only applies to the privileges contained within division 8 of the Evidence Code. It does not apply to the qualified work product privilege which is established in the Code of Civil Procedure. (See *post.*)

■ The standard of review upon a finding to support the crime/fraud exception is stated in *BP Alaska Exploration, Inc.* v. *Superior Court, supra*, 199 Cal.App.3d at pages 1261-1262: "The appellate court may not weigh the evidence, resolve conflicts in the evidence, or resolve conflicts in the inferences that can be drawn from the evidence. *If there is substantial evidence in favor of the finding, no matter how slight it may appear in comparison with the contradictory evidence, the finding must be affirmed.* [Citation.]" (Italics added.) Thus, we focus upon whether there is sufficient evidence to support the implied finding of a prima facie case to apply the crime/fraud exception: whether the services of the Berger Firm were retained and utilized to enable State Farm to commit a crime or a fraud; and whether there exists " 'a reasonable relationship between the [crime or] fraud and the attorney-client communication. [Citation.]' " (*People* v. *Superior Court (Bauman & Rose), supra*, 37 Cal.App.4th at p. 1769.) In that connection, it is the intent of the client upon which attention must be focused and not that of the lawyers. (*Glade* v. *Superior Court* (1978) 76 Cal.App.3d 738, 746 [143 Cal.Rptr. 119].)

In turning to a review of the evidence, it is important to keep in mind the context in which this dispute arose: that is, real parties offered the declarations of Ms. Zuniga in support of their request that the court reconsider its grant of summary judgment and denial of their motion to file a third amended complaint. We turn now to a review of the evidence offered.

In the motion for reconsideration, real parties proffered documents from an Arizona case titled *Martin* v. *State Farm* and from three cases involving State Farm Mutual Automobile Company, which they contended disclosed discovery abuses by State Farm. They urged that these other cases demonstrated a pattern of discovery abuse similar to that in *In re Sealed Case* (D.C. Cir. 1985) 754 F.2d 395 [244 App.D.C. 11] where the crime/fraud exception was applied. In that case the court found that Synanon Church had "embarked on a massive and systematic program to destroy and alter subpoenaed evidence or evidence sought pursuant to civil discovery requests." (*In re Sealed Case, supra,* 754 F.2d at p. 397.) The court reviewed declarations of two former employees of Synanon: "The . . . affidavits [of the employees], based on the personal observations and participation of the affiants, reveal in extraordinary detail a pervasive and systematic scheme to destroy or alter subpoenaed evidence. The affidavits further reveal Synanon's continuing efforts to conceal its wrongdoing before courts in which it was involved in litigation—all with the knowledge and participation of Synanon's legal department. Synanon archivist, Steve Simon, for example, routinely perjured himself in litigation in which Synanon was involved, as did other Synanon officials. The affidavits also show that the computer tape inventory presented by Simon [in another matter] had been deliberately falsified." (*Id.* at p. 400.)

State Farm objected to receipt of the documents from *Martin* v. *State Farm*, on the basis of lack of authentication, and it argued that the other three cases involved State Farm Mutual Automobile Insurance Company, a separate insurance company from State Farm Fire and Casualty Company. It also pointed out that in one of the other cases, *Singh* v. *State Farm*, a contempt citation was vacated after the case settled. It urged that these four cases among "thousands upon thousands" of cases throughout the country do not support a conclusion that it is involved in a "scheme of spoliating evidence."

We agree with State Farm that this limited evidence does not suggest a broad scheme to defraud similar to that discussed in *In re Sealed Case*. We now turn to the evidence proffered in regard to this particular case.

The motion for summary judgment centered on two primary issues: (1) misrepresentations of earthquake coverage in connection with real

parties' insurance policy; and (2) whether State Farm complied with statutory mailing requirements of Insurance Code sections 10081 through 10089.2 and former section 10089.3. On the first issue, State Farm presented evidence that the policy issued did not have earthquake coverage, that none had been requested, and that any representation otherwise was attributed to agents for real parties. On the second issue, State Farm presented declarations of Richard Churik and Charles G. Hook as evidence in support of its assertion that State Farm had complied with the mailing provisions of the Insurance Code. Its proof relied upon use of the automatic insertion machine and State Farm's custom and practice.

Real parties presented evidence in opposition to the motion for summary judgment to establish that State Farm had been less than candid in responding to discovery. The proposed third amended complaint alleged that State Farm's agent had committed forgery in issuance of the insurance policy; that he covered up the forgery; and that after claim had been made to State Farm, and it was advised of the forgery, it failed to investigate the claim or take steps to reevaluate the claim. The proposed pleading also alleged intentional spoliation of evidence.

While we have not been provided with the actual motion for reconsideration, it is clear from what real parties attempted to prove in opposition to the summary judgment, the issues raised in connection with the proposed third amended complaint, and those portions of the declarations of Amy Zuniga which are not privileged, that real parties, at the least, are asserting that State Farm is perpetrating a fraud upon the court in connection with this litigation. The circumstances surrounding the privileged communications show that the communications were made in connection with discovery undertaken during this litigation. From this we conclude that there is a reasonable relationship between the communications and the alleged fraud. We now turn to a review of the evidence relating to the alleged fraud.

In opposition to the motion for summary judgment a number of items were presented to suggest that evidence provided by State Farm was not true or complete. The declaration of Samantha Bird established that in 1990 State Farm adopted a policy of destroying potentially relevant documents to avoid producing them in bad faith actions. The declaration of Linda Crisafulli suggested that the declarations page used by State Farm in connection with the motion for summary judgment may have been "manufactured." The declaration of a handwriting expert suggested that the original application may have been forged. Real parties also argued that existing documents had not been produced.

Turning now to the declarations of Ms. Zuniga, we set out verbatim paragraphs 3 through 5. "3. . . . , I am aware that there were many other

State Farm claims arising out of the Northridge earthquake like the Taylors' involving unauthorized signatures by State Farm agents or agency employees on applications omitting earthquake coverage. At the time of the Taylor claim, the Company was well aware that this was a problem. As a matter of practice, the Company would pay these claims, if it believed that the forgery issue would be brought to light and proven by the insured. Because of the forgery issue in the Taylor case, if the case was not dismissed on summary judgment, it was my impression that the claim was going to be reconsidered. However, we were waiting to see if we could save money on the Taylor claim by having summary judgment granted, and as part of that plan I was instructed not to provide certain relevant information at my depositions. [¶ 4. Specifically, my supervisor in the SAC unit, Vanessa Gudelj, and her supervisor, John Poptanich, put pressure on me to withhold the existence of documents memorializing certain State Farm claims handling guidelines from plaintiffs' counsel Bernie Bernheim at my deposition, which they believed, if revealed, would defeat summary judgment and ultimately lead to payment of the Taylors' claim. They pressured me into not revealing the existence of claims handling documents which established guidelines under which claims like the Taylors were to be handled. These included a three ring binder called 'CATHR Management Information and Memos Manual' used and maintained by Claim Superintendent Tinga Nicholson who was the Claim Superintendent that denied the Taylors' claim. It was responsive to the Taylors' discovery request and we simply chose not to produce it. Similarly, Ms. Nicholson had prepared a breakdown of earthquake claims in her unit . . . by category of claim, and one of the categories was 'unauthorized signatures.' This document showed the percentage of total earthquake claims which involved unauthorized signatures. This document, too, was never produced. [¶ 5. The Taylors' claim was denied by personnel working in the so-called 'Special Handling Unit.' In addition to the claims handling documents mentioned above, we never produced to Mr. Bernheim a document memorializing a SHU meeting at which the subject of unauthorized signatures on applications omitting earthquake insurance was discussed."

Those portions of the September 25 declaration, which are not privileged, contain similar accusations by Ms. Zuniga. She identifies an "Administrative Services" manual for the AIM system which was responsive to real parties request for production but which was not produced. She identifies information which she claims contradicts statements made by Charles Hook in his declaration in support of the motion for summary judgment. She declares that she was involved in a conversation with "one of the Company's senior executives" in which he advised "that State Farm witnesses should not admit that forgeries happen, unless and until they are compelled to do so by Court order." In the same conversation he also advised that "we have to decide

how to tell our story should the Company be compelled to admit that it has knowledge of the 'unauthorized signatures.' He said we should try to make this practice look like a 'service.' " She states that she was aware of the existence of a number of documents "pertaining to the Company's practices and procedures regarding signatures and the taking of applications by agents which were never produced to plaintiffs in the *Taylor* case." She also declares that State Farm prepares witnesses "on how to give up as little information as possible at deposition."[5] But for trial, the witnesses "were trained to appear helpful and polite, and to drop the evasive tactics used to keep information from being disclosed at deposition."

We conclude the foregoing evidence is more than sufficient for application of the crime/fraud exception to the privileged materials contained in the Zuniga declarations.

State Farm suggests that if we conclude a prima facie showing was made that we should remand the matter to the trial court so it can present evidence to rebut the showing made. We see no reason to do so. State Farm marshaled and presented evidence to contradict the statements made by Ms. Zuniga and the arguments of real parties and the trial court allowed a full hearing on the issues.

*The Work Product Privilege*

State Farm and its counsel assert the work product privilege applies to several paragraphs of each of Ms. Zuniga's declarations.

Code of Civil Procedure section 2018 states: "(a) It is the policy of the state to: (1) preserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases; and (2) to prevent attorneys from taking undue advantage of their adversary's industry and efforts. [¶] (b) Subject to subdivision (c), the work product of any attorney is not discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice. [¶] (c) Any writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories shall not be discoverable under any circumstances."

Code of Civil Procedure section 2018, subdivision (b) is known as the *qualified* work product privilege, while subdivision (c) is the *absolute*

---

[5]This claim appears to be corroborated by passages from the deposition of Toni Hotzel; see footnote 2, *ante*.

work product privilege. Discovery is allowed of material which falls within the qualified privilege where denial of discovery will unfairly prejudice the party seeking it or result in an injustice. However, disclosure of material which qualifies under the absolute work product cannot be compelled, not even to the client. (*Lasky, Haas, Cohler & Munter* v. *Superior Court* (1985) 172 Cal.App.3d 264, 279 [218 Cal.Rptr. 205].) To qualify as absolute work product, the attorney's impressions, conclusions, opinions, legal research or theories must be contained within a writing.

 Neither of Ms. Zuniga's declarations discloses, or attempts to disclose, any writings which qualify for treatment within the absolute work product privilege.[6] Therefore, we review the claim of work product to determine whether or not an injustice may occur or whether denial of the disclosure of the information will unfairly prejudice real parties.[7]

In California, the crime/fraud exception only applies to attorney-client privileged materials; *it does not apply to the work product privilege.* (*BP Alaska Exploration, Inc.* v. *Superior Court, supra,* 199 Cal.App.3d at p. 1251; see also *Geilim* v. *Superior Court, supra,* 234 Cal.App.3d at p. 175.) However, the same analysis we utilized for the crime/fraud exception leads to the inevitable conclusion that refusal to allow disclosure of the information contained in the Zuniga declarations would not only unfairly prejudice real parties, it would also result in an injustice.

*Trade Secret Information*

The only information asserted to fall within the concept of trade secret is contained in paragraph 28 of Zuniga's September 25 declaration. It gives the name of a computer program within State Farm for locating documents.

Evidence Code section 1060 provides: "If he or his agent or employee claims the privilege, the owner of a trade secret has a privilege to refuse to disclose the secret, and to prevent another from disclosing it, *if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice.*" (Italics added.)

Evidence Code section 1061, subdivision (b)(1), sets out the appropriate procedure to utilize in litigation where a party claims the trade secret privilege. "The owner of the trade secret shall file a motion for a protective

---

[6]At oral argument counsel for State Farm conceded that we are reviewing material which falls within the qualified privilege.

[7]Because of our ultimate determination on the issue of good cause to disclose the information, we have not analyzed the declarations to determine specifically which material does fall within the qualified work product privilege.

order. . . . The motion shall include an affidavit based upon personal knowledge listing the affiant's qualifications to give an opinion concerning the trade secret at issue, identifying, without revealing, the alleged trade secret and articles which disclose the secret, and presenting evidence that the secret qualifies as a trade secret under either subdivision (d) of Section 3426.1 of the Civil Code or paragraph (9) of subdivision (a) of Section 499c of the Penal Code. [¶] . . . [¶] (3) The movant shall, by a preponderance of the evidence, show that the issuance of a protective order is proper." The section also provides broad discretion to the trial court to allow a litigant access to the trade secret information where it is relevant, but otherwise protect it from dissemination. (Evid. Code, § 1061, subd. (b)(4)(C)(i).)

Civil Code section 3426.1, subdivision (d) and Penal Code section 499c, subdivision (a), paragraph (9) are identical in their wording: " 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

For purposes of this proceeding, we have no problem assuming that the software program is a trade secret. However, disclosure of this information is also subject to a fraud or injustice exception. (Evid. Code, § 1060.) The facts presented certainly justify disclosure of the information. Further, the information which is disclosed in the Zuniga declaration is so minimal we see no danger that it can be used by another to obtain economic value in competition with State Farm.

*Conclusion*

We conclude that substantial evidence exists to support the implied findings of the trial court for application of the crime/fraud exception to the attorney-client privilege, and that to preclude disclosure of information in the Zuniga declarations would work a fraud or injustice. The trial court properly ordered the declarations unsealed. We caution that our conclusion is limited to the existence of evidence sufficient to support disclosure of the information; nothing more.

THE PROTECTIVE ORDERS SOUGHT

█ Because we have concluded that the court did not err in unsealing the Zuniga declarations, no protective order is appropriate to preclude their dissemination.

State Farm has requested that counsel for real parties be restrained from disseminating information of a privileged nature which he learned or otherwise obtained from Ms. Zuniga. Other than the information contained in the declarations, we have no evidence that counsel has any other information, or, if he does, that he plans to disseminate it. In fact, after he initially spoke with Ms. Zuniga, counsel for real parties contacted State Farm's counsel and advised of his contact and provided the opportunity for State Farm to seek the protective order. Therefore, we have no foundation upon which to issue the order requested.

State Farm suggests that contact between counsel for real parties and Ms. Zuniga was somehow improper and requests a protective order which precludes counsel from inquiring further of Amy Zuniga about any matters protected by the attorney-client, work product, or trade secret privileges. The only evidence of any contact between real parties' counsel and Ms. Zuniga prior to her termination from State Farm was when he took the first portion of her deposition, during which she was represented by counsel. Otherwise the record reflects that the contact came after Ms. Zuniga's termination.

Counsel representing a client opposing a corporate defendant has a right to meet ex parte with ex-employees of the corporation, even if they were managerial employees. (*Continental Ins. Co.* v. *Superior Court* (1995) 32 Cal.App.4th 94, 119-121 [37 Cal.Rptr.2d 843]; *Bobele* v. *Superior Court* (1988) 199 Cal.App.3d 708, 714-715 [245 Cal.Rptr. 144].) While counsel may not inquire about *privileged communications*, inquiry may be made with regard to relevant *facts*. (*Bobele* v. *Superior Court, supra*, 199 Cal.App.3d at pp. 714-715.) While we agree that some of the information contained in the Zuniga declarations falls within the attorney-client and work product privileges, there is also factual information which is not privileged. The record does not reflect whether counsel inquired into the privileged areas or whether the information was volunteered by Ms. Zuniga. Also, as we have discussed, the evidence supports a conclusion that the crime/fraud exception applies and that good cause exists to disclose the work product and trade secret information contained within the Zuniga declarations. Counsel would have been remiss in representing his clients had he not followed up on the contact with Ms. Zuniga. Based on the record presented, we conclude Mr. Bernheim is guilty of no wrongdoing and we find no need to issue a protective order against him.

If State Farm is concerned about disclosure of other potentially privileged information by Ms. Zuniga, it has a right to seek a protective order (*Bobele* v. *Superior Court, supra*, 199 Cal.App.3d at p. 715), and we have been

advised that a separate action is pending requesting injunctive relief against Ms. Zuniga.[8]

### DISPOSITION

The petition is denied. The alternative writ is discharged and the matter is remanded to the trial court. Our order sealing all documents in connection with this writ proceeding will continue until this opinion becomes final, at which time the order is vacated. Costs are awarded to real parties.

Vogel (C. S.), P. J., and Aranda, J.,* concurred.

A petition for a rehearing was denied May 14, 1997, and petitioner's application for review by the Supreme Court was denied July 9, 1997. Kennard, J., and Werdegar, J., were of the opinion that the application should be granted.

---

[8]We also conclude that Mr. Bernheim is not guilty of contempt by reason of the fact he filed sealed copies of the Zuniga declarations in this other pending action. Therefore, we deny the request to issue an order to show cause by State Farm.

*Judge of the Municipal Court for the South Bay Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.