[No. B087442. Second Dist., Div. Seven. Oct. 30, 1995.]

WESTINGHOUSE ELECTRIC CORP., Plaintiff and Appellant, v. NEWMAN & HOLTZINGER, P. C., et al., Defendants and Respondents.

COUNSEL

Lasky, Haas & Cohler, Moses Lasky and Charles B. Cohler for Plaintiff and Appellant.

Nowland C. Hong, Michael M. Mullins, Maurice A. Leiter, Michael Paul Mihalek, William & Connolly, Brendan V. Sullivan, Peter J. Kahn, John D. Cline, Choate & Choate and Joseph Choate, Jr., for Defendants and Respondents.

## OPINION

**JOHNSON, J.**—Westinghouse Electric Corp. attempts to state causes of action sounding in tort and breach of contract against attorneys who allegedly conspired to disclose documents covered by a secrecy agreement in a previous lawsuit. The trial court held the attempt failed. We agree.

### FACTS AND PROCEEDINGS BELOW

Westinghouse was the defendant in a suit brought by the Southern California Edison Company (SCE) in federal court. The SCE suit alleged Westinghouse made false representations about steam generators it sold to the utility for use in its nuclear power facilities. SCE was represented in the federal court action by Newman & Holtzinger, P. C. (Newman), and Chase, Rotchford, Drukker & Bogust (Chase), defendants in the present action. The other defendant in the present action, Shaw, Pittman, Potts & Trowbridge (Shaw), did not represent a party in the SCE suit but is alleged to have conspired with Newman and Chase to violate the secrecy agreement in that suit.

We summarize the Westinghouse complaint here and discuss it in more detail below.

Essentially the complaint alleges that in the course of the SCE suit Newman and Chase requested production from Westinghouse of certain highly sensitive documents. These documents pertained to evaluations, reviews, and analyses by Westinghouse engineers of actual and potential problems involving the nuclear steam generators Westinghouse manufactured "and the environment in which they operate." Included in these documents were "candid," "rigorous" and "critical self-evaluations" exchanged between the engineers working on these problems. The complaint states that "[a]mong the thoughts expressed . . . in those documents were expressions about the efforts being made by Westinghouse to resolve issues encountered, or said to be encountered, by utilities in operation and to expand upon the state of the art. Wrenched from proper context, portions of those documents were susceptible to contrary meanings."

Westinghouse voluntarily offered to produce the documents on condition SCE and Newman and Chase agree not to disclose them to anyone other than

specified parties and not to use the documents for any purpose beyond the SCE suit itself. Newman and Chase orally agreed to these conditions, which were subsequently incorporated into a stipulated protective order in the SCE suit. In reliance on this agreement and the representations of Newman and Chase, SCE produced the documents. Newman and Chase violated their nondisclosure agreement with Westinghouse by filing the restricted documents in the public records of the SCE case and then informing Shaw, which also represented a client in a legal proceeding against Westinghouse, "if it examined the public file in the SCE case it would find Westinghouse documents of which it could make use." Upon receiving this tip, Shaw, knowing the documents were restricted under the agreement, inspected and made copies of the documents and used them in representing its client against Westinghouse. Shaw also disseminated the documents among other utility companies "to generate a united front against Westinghouse."

It is alleged Newman, Chase and Shaw acted in concert for the purpose of disclosing and disseminating the restricted documents to other law firms, particularly Shaw, for use in litigation against Westinghouse and that the defendants made false representations to Westinghouse in an effort to conceal their misuse of the restricted documents.

Westinghouse claims that by reason of the defendants' unlawful disclosure of the documents it was damaged by having to expend "millions of dollars" defending lawsuits based on the information contained in those documents.

Defendants' initial response to the present action was to remove it to federal court. Westinghouse moved for remand to the state court and defendants moved to dismiss. The district court denied the motion to remand and dismissed the action. The Ninth Circuit reversed, holding there was no federal subject matter jurisdiction over the present action and the proper remedy was to remand the matter to the state court. (*Westinghouse Elec.* v. *Newman & Holtzinger, P.C.* (9th Cir. 1993) 992 F.2d 932, 933 (*Westinghouse I*).)

Upon remand to the state court, defendants demurred to the complaint on the ground it failed to state a cause of action under any theory of tort or breach of contract. The trial court sustained the demurrers without leave to amend and ordered the action dismissed. Westinghouse filed a timely appeal from the judgment of dismissal.

For the reasons explained below, we hold the complaint fails to state a cause of action in tort because it fails to allege cognizable tort damages. The

complaint fails to state a cause of action for breach of contract because a protective order supersedes any previous secrecy agreement between the parties or their attorneys covering the same documents.

DISCUSSION

I. *Standard of Review.*

For purposes of this appeal we accept as true the properly pled factual allegations of the complaint. (*Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 746 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701].) Furthermore, the allegations of the complaint must be read in the light most favorable to the plaintiff and liberally construed with a view to attaining substantial justice among the parties. (Code Civ. Proc., § 452; *King* v. *Central Bank* (1977) 18 Cal.3d 840, 843 [135 Cal.Rptr. 771, 558 P.2d 857].) With these considerations in mind, we review the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under *any* legal theory. If it does not, we next determine whether the complaint reasonably could be amended to state a cause of action. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

II. *Inducing a Third Party to Bring Litigation on a Meritorious Claim Cannot Be the Basis for Tort Liability.*

We first consider whether Westinghouse has alleged facts which give rise to tort liability on the part of the defendants or whether the complaint reasonably could be amended to state a tort cause of action.

The complaint alleges the following facts relevant to tort liability.

In the course of the SCE litigation, Westinghouse voluntarily produced certain sensitive documents to SCE in return for an agreement by SCE's attorneys, Newman and Chase, not to exhibit, deliver or disclose those documents to anyone other than specified parties and not to use those restricted documents for any purpose other than the SCE case itself. "[T]hereafter and pursuant to agreed concert" between Newman, Chase and the Shaw firm, Newman and Chase "filed in the public record in the SCE case the documents produced by Westinghouse and informed [Shaw] that if it examined the public file in the SCE case it would find Westinghouse documents of which it could make use. Thereupon [Shaw], knowing that it could not properly have access to these documents, inspected and made copies of them. Thereafter, [Shaw] hawked them among utility companies to generate a united front against Westinghouse." Shaw also used the documents in representing a client in a legal proceeding against Westinghouse.

Newman and Chase placed the restricted documents in the public files with the intent "to disclose and deliver the documents to other law firms, particularly Shaw" for the purpose of encouraging lawsuits against Westinghouse.

At the time Newman and Chase improperly disclosed and delivered the Westinghouse documents to Shaw "Westinghouse was meeting with utilities which had acquired steam generator equipment from it to discuss steam generators and the evolving state of the art and to satisfy customers' concerns on the subject. The documents improperly obtained from the files in the SCE case were published, given widespread dissemination, manipulated and distorted by [Shaw] to divert utilities from continuing to deal on an amicable and commercial basis with Westinghouse as they had done in the past. In disseminating the documents, [Shaw] and those to whom it in turn disseminated them, distorted their meaning as suggesting that Westinghouse had committed fraud upon its customers."

The conduct of Newman and Chase, described above, "was an embezzlement of Westinghouse's files . . . and it inflicted injury and damage upon Westinghouse, and was intended to do so." By receiving and using the documents, Shaw was guilty of receipt of stolen property and liable to Westinghouse for treble damages, attorney fees and costs. (Pen. Code, § 496, subds. (a), (d).)

Newman, in concert with Chase and Shaw "affirmatively and falsely represented to Westinghouse in writing on or about July 26, 1988, that neither it nor anyone associated with it had provided to any third party any document produced by Westinghouse pursuant to the protective order."

"As a result of defendants' conduct, Westinghouse has been sued by public utility companies, generally charging Westinghouse with fraud and other misconduct in connection with the sale of steam generator equipment basing the charge on the documents. These lawsuits would not have been commenced or prosecuted but for [defendants'] theft . . . and receipt of Westinghouse's documents as aforesaid, by reason of which Westinghouse has been damaged by the unlawful conduct of defendants as alleged above in an amount exceeding millions of dollars."

Defendants initially contend Westinghouse is attempting to turn violation of a discovery order into a tort—a tactic which courts have uniformly rejected. (See, e.g., *Westinghouse I, supra,* 992 F.2d at p. 934; *Liberty Leather Corp. v. Callum* (1st Cir. 1981) 653 F.2d 694, 700; *Countryside Casualty Co. v. Orr* (8th Cir. 1975) 523 F.2d 870, 872, fn. 3; cf. *Pollock* v.

*Superior Court* (1991) 229 Cal.App.3d 26, 29-30 [279 Cal.Rptr. 634] [public policy prohibits attorneys from suing each other over conduct occurring in the course of litigation].) We reject this characterization of the Westinghouse complaint for the reasons explained below.

The complaint is ambiguous as to whether Westinghouse turned over the documents in reliance on the stipulated protective order entered by the district court, the preexisting agreement with Newman and Chase or both. However, we agree with the Ninth Circuit that reading the complaint in the light most favorable to Westinghouse for purposes of ruling on the demurrer, the alleged tort liability is not premised on a violation of the district court's discovery order. Rather, the complaint suggests Newman and Chase, for themselves and not merely as SCE's representatives, obtained the documents by entering into a nondisclosure agreement with Westinghouse which preceded the stipulated discovery order. (*Westinghouse I, supra,* 992 F.2d at p. 935.) As the Ninth Circuit pointed out, the complaint does not say Westinghouse produced the documents solely on the basis of the discovery order; nor does it incorporate the discovery order by reference. In addition, the discovery order only applies to the parties to the litigation and others who agree to be bound by it. (*Ibid.*) The complaint does not allege Newman and Chase ever entered into such an agreement. Thus, it does not appear from the facts pled Newman and Chase would be subject to sanctions for violating the district court's protective order, especially if they acted on their own, without their client's knowledge, in disclosing the documents to Shaw. Shaw, of course, could not be subject to sanctions under the protective order because it was not a party bound by the order. We note SCE, which was subject to the protective order, is not a defendant in this action.

Furthermore, even if the trial court's protective order superseded the secrecy agreement between Westinghouse, Newman and Chase (see discussion in pt. III, *post*) this would not necessarily bar Westinghouse from bringing a tort suit based on disclosure of the restricted documents. While we agree violation of a discovery order is not in and of itself a tort, we can conceive of situations in which wrongful disclosure of information covered by a protective order could be both a discovery violation *and* a tort. It could certainly be argued, for example, unlawful disclosure of a trade secret should result in liability for damages regardless of the fact the defendant's disclosure also violated a protective order. Similarly, it would seem disclosure of sensitive or embarrassing facts about a party in violation of a protective order could support an action for invasion of privacy and infliction of emotional distress. In the present case, the Westinghouse complaint appears

to allege several theories of tort liability, including interference with contractual relations and prospective business advantage, misappropriation of trade secrets, trade libel and fraud.[1]

However, we do not reach the question whether a separate lawsuit can be maintained for conduct which is both a tort and a discovery violation because Westinghouse's complaint fails to allege compensable tort damages. The only damage alleged to have resulted from defendants' conduct is that "Westinghouse has been sued by public utility companies . . . by reason of which Westinghouse has been damaged . . . in an amount exceeding millions of dollars." Inducing a third party to bring litigation on a meritorious claim cannot be the basis for tort liability. (*Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1130-1137 [270 Cal.Rptr. 1, 791 P.2d 587] (*PG&E*).)

In *PG&E* the defendant, an investment brokerage firm, induced a county water agency to bring a declaratory relief action for the purpose of determining whether the agency could legally terminate its contract to sell water to PG&E. If the contract was terminated, the investment firm stood to gain financially by placing the agency's hydroelectric power contract with another utility at a higher price. PG&E brought a parallel lawsuit against the investment firm alleging the firm's conduct in encouraging and financing the agency's declaratory relief action amounted to a tortious interference with contract and business relations. The trial court sustained demurrers to these causes of action without leave to amend and dismissed the complaint. The California Supreme Court affirmed these rulings, holding: "to allow either cause of action to be stated when the only interference alleged is that the defendant induced the bringing of potentially meritorious litigation would be an unwarranted expansion of the scope of these torts and a pernicious barrier to free access to the courts." (50 Cal.3d at p. 1123.)

In explaining the basis for its holding the Supreme Court observed "free access to the courts would be choked off" if a "person who induced another to bring a lawsuit involving a colorable claim could be liable in tort." (50 Cal.3d at p. 1136.) "Our legal system is based on the idea that it is better for citizens to resolve their differences in court than to resort to self-help or

---

[1] We recognize the litigation privilege (Civ. Code, § 47, subd. (b)) might bar tort actions based on disclosure of information obtained in discovery. However, the applicability of the litigation privilege would have to be determined from the particular facts of each case. (See *Ribas* v. *Clark* (1985) 38 Cal.3d 355, 365 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417] [tort claim for invasion of privacy barred by litigation privilege]; *ITT Telecom Products Corp* v. *Dooley* (1989) 214 Cal.App.3d 307, 317, 323 [262 Cal.Rptr. 773] [tort claim for disclosure of trade secrets barred by litigation privilege].)

force. It is repugnant to this basic philosophy to make it a tort to induce potentially meritorious litigation. [To do so ] would threaten free access to the courts by providing an end run around the limitations on the tort of malicious prosecution." (50 Cal.3d at p. 1137.)

Clearly, the court's reasoning in the *PG&E* case is not limited to the torts of interference with contract or business relations, but applies to any tort action seeking to impose liability for inducing a potentially meritorious lawsuit. Because this is the only conduct alleged to have caused injury in the present case, Westinghouse's complaint failed to state a claim for relief based in tort.[2]

Defendants argued in the trial court as well as on this appeal the *PG&E* decision barred a tort cause of action in this case because Westinghouse failed to allege any damage other than expending "millions of dollars" in defending actions brought on the basis of the disclosed documents. Westinghouse has had ample opportunity to claim it could truthfully amend its complaint to allege some cognizable form of damage, e.g., injury to its reputation, diminution in the value of its stock, loss of potential customers, etc., but has failed to do so. Thus, we conclude the complaint could not be amended to state a cause of action in tort. We affirm the sustaining of the demurrers as to the tort cause of action without leave to amend.

III. *A Protective Order Issued by the Trial Court Supersedes Any Previous Secrecy Agreement Between the Parties or Their Attorneys Covering the Same Documents.*

As we explained above, the complaint alleges a secrecy agreement between Westinghouse, Newman and Chase which preceded the district court's protective order. The complaint also alleges the conditions on disclosure of the Westinghouse documents contained in the secrecy agreement were incorporated into the protective order. The question posed by these allegations is whether violation of either the protective order or the preceding agreement will support a cause of action for breach of contract. The answer is no.

A. *Violation of a Discovery Order Does Not Give Rise to an Action for Breach of Contract.*

At the time the protective order was entered in the SCE case, rule 26(c) of the Federal Rules of Civil Procedure (28 U.S.C.) provided in

---

[2]Westinghouse does not allege the suits it was forced to defend lacked merit; nor does it allege a cause of action for malicious prosecution. (*PG&E, supra*, 50 Cal.3d at p. 1137.)

relevant part: "Upon motion by a party . . . from whom discovery is sought, and for good cause shown, the court in which the action is pending . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way."

After such an order is entered, rule 37 of the Federal Rules of Civil Procedure provides the remedies for its violation. These remedies include sanctions against the offending party in the form of costs and attorney fees, evidence preclusion, issue preclusion, striking pleadings, entering a default judgment, and holding the offending party in contempt. (Fed. Rules Civ.Proc., rule 37(b)(2).) The relief afforded for noncompliance with a protective order depends exclusively upon rule 37 of the Federal Rules of Civil Procedure. (*Societe Internationale* v. *Rogers* (1958) 357 U.S. 197, 207 [2 L.Ed.2d 1255, 1264, 78 S.Ct. 1087]; *Fjelstad* v. *American Honda Motor Co.* (9th Cir. 1985) 762 F.2d 1334, 1338; *Pickel* v. *United States* (3d Cir. 1984) 746 F.2d 176, 182, fn. 8.)

Westinghouse argues that where a protective order is entered with the consent of the parties, as occurred in the SCE litigation, the order has a dual aspect—both as a court order and as a contract. Therefore, it may be enforced either by discovery sanctions or by an ordinary action at law. The cases cited by Westinghouse do not support this argument.

Westinghouse cites a passage from *Westinghouse I* in which the court states: "The mere fact that a district court has issued a protective order regarding disclosure of confidential information does not preclude the existence of a separate and independent non-disclosure agreement. As with the contract alleged here, that agreement might directly bind persons not bound by the order itself. The agreement may even have more or less encompassing terms than the order. *It follows that the agreement may be enforced without affecting the order or interfering with the court's enforcement of that order.*" (992 F.2d at p. 937, italics added.)

This passage, however, is taken out of context. The issue in *Westinghouse I* was whether the federal courts had jurisdiction over the present action. In the quoted passage, the court was explaining why the existence of a federal court discovery order would not give rise to federal jurisdiction over Westinghouse's breach of contract claim under the doctrine of "complete preemption." (992 F.2d at pp. 935-936.) The Ninth Circuit specifically left open the question whether there was any " 'continued legality or viability of a pre-existing . . . contract' because Westinghouse's rights are covered by the

protective order." (*Id.* at p. 936.) Defendants, the court noted, " 'may raise this question in state court.' " (*Ibid.*) The other authorities cited by Westinghouse are similarly taken out of context and do not support its "dual aspect" argument.

### B.   *A Protective Order Supersedes Any Previous Secrecy Agreement Between the Parties or Their Attorneys Covering the Same Documents.*

█   It has long been the rule in this state that a preexisting agreement between the parties is extinguished upon its incorporation into a court order. Once the agreement is merged into the court's order, neither party any longer has a right of action based on the agreement because the obligations imposed are not imposed by the agreement but by the order and are enforceable as such through contempt and other sanctions available to the court. (*Hough* v. *Hough* (1945) 26 Cal.2d 605, 609-614 [160 P.2d 15].) Although this "merger" rule has traditionally been applied in the context of divorce actions, where a preceding property or maintenance agreement is incorporated into the interlocutory decree, the policy reasons for the rule are just as applicable in the discovery context.

In *Hough,* the plaintiff commenced a divorce action against her husband. The parties entered into an agreement covering distribution of community property, alimony and child support. The interlocutory decree of divorce tracked the provisions of the parties' agreement and stated the agreement was "approved by the Court." (26 Cal.2d at p. 607.) Subsequently, the trial court issued an order modifying the decree by reducing the wife's alimony payments from $200 a month to $100 a month. No appeal was taken from that order. Eight years later the wife brought an action for breach of contract based on the parties' original agreement. She sought to recover the difference between the $200 a month alimony provided for in the agreement and the $100 a month alimony the husband had been paying following the order modifying the decree. The trial court gave judgment to the wife. The Supreme Court reversed. (*Id.* at p. 608) The court held a party in a divorce proceeding had no right of action based on a separation agreement subsequently incorporated into a divorce decree. (*Id.* at p. 614.)

In reversing the judgment in *Hough,* the court explained why allowing a suit on the preceding agreement would violate public policy and sound

principles of judicial administration. Quoting an opinion of the Ohio Supreme Court,[3] our Supreme Court pointed out " '[o]ne of the precise issues involved in the divorce action is whether or not support payments should be ordered and if so the amount thereof. The agreement deals with identical questions. When it is incorporated in and made an operative part of the decree, there is no longer any occasion for its independent existence.' " (26 Cal.2d at p. 610.) Furthermore, ordering support payments in the terms of the agreement would be an " 'empty gesture' " if the agreement could be enforced regardless of the decree. (*Ibid.*) The court also expressed concern the " 'power of the court to modify the decree upon a showing of changed circumstances . . . which is based on sound policy would be seriously impaired, and any attempt on [the court's] part to give relief thereunder would be abortive if the parties could still enforce the agreement which had been made a part of the decree. . . . [T]he end result would be that a matter in which the state has a vital interest, the support allowance, would be outside the policy declared by the state.' " (*Ibid.*) The court further noted, " 'To hold that the contractual rights of the parties survive the decree seems to leave the party in whose favor the modification was ordered in substantially the same position as before. Instead of the deep blue sea of [the] contempt process, he is confronted with the devil of sheriff's sale.' " (*Id.* at p. 611.) Finally, the court concluded the state's interest in its citizens' marital status and dissolution thereof required alimony payments be continuously " 'subject to [the] scrutiny of the courts as to fairness and adequacy' " rather than left exclusively to the private agreement of the parties. (*Ibid.*)[4]

 Turning to the case before us, we conclude sound principles of judicial administration support our precluding a breach of contract suit based

---

[3]*Holloway* v. *Holloway* (1935) 130 Ohio St. 214 [4 Ohio Ops. 156, 198 N.E. 579, 154 A.L.R. 439].

[4]In *Westinghouse I,* the Ninth Circuit found this action to be unlike *Hough* because here the protective order did not specifically incorporate the prior secrecy agreement and the law firms did not ask that their secrecy agreement become part of the order. (992 F.2d at p. 936.) We are not bound by the Ninth Circuit's interpretation of *Hough.* In our view, the "merger" doctrine does not require the preceding agreement to be specifically incorporated by reference into the trial court's protective order or that the parties or their attorneys request an incorporation of the preceding agreement. In *Hough,* the court stated, " '[t]he parties, in making the agreement *will be presumed* to have entered into the same with the understanding that the trial court possessed the power to change or modify the award or provision made for support . . . .' " (26 Cal.2d at p. 612, some italics deleted.) The court went on to state, " '[i]t is not vital that the agreement . . . provides [for incorporation into the court order.] *The action of the parties and the court in the . . . proceeding may be determinative.*' " (*Id.* at p. 613, italics added.) Furthermore, in the present case Westinghouse specifically alleged it produced the documents to Newman and Chase "after the court, *pursuant to agreement of the parties,* entered a protective order which imposed the condition on which Westinghouse agreed to produce them." (Italics added.) From preceding allegations in the complaint, it is clear the "condition on which Westinghouse agreed to produce [the documents]" was the same condition contained in the parties' private secrecy agreement.

on the parties' secrecy agreement. One of the "precise issues" involved in the underlying SCE litigation was whether and to what extent SCE could discover the confidential, proprietary information contained in the Westinghouse files. The secrecy agreement dealt with the identical issues. Once the agreement was incorporated into and made an operative part of the district court's protective order, there was no longer any purpose to its independent existence. (Cf. *Hough* v. *Hough, supra,* 26 Cal.2d at p. 610.) Furthermore, entering a protective order covering the same documents that were covered in the agreement would be an "empty gesture" if the agreement could be enforced regardless of the protective order. (*Ibid.*)

More importantly, allowing a breach of contract action based on the parties' secrecy agreement would divest the trial court of the power to regulate discovery in the underlying action because the trial court could neither modify the agreement on a showing of "good cause" nor relieve a party from compliance based on a change in circumstances.[5] The court's act of modifying, interpreting or enforcing its order would be entirely ineffectual if a party who disagreed with the court's action could still enforce the preceding agreement. Suppose, for example, on motion of party A the trial court modified the protective order to permit party A to share documents it obtained from party B with attorneys involved in similar litigation against party B. (See, e.g., *American Tel. & Tel. Co.* v. *Grady, supra,* 594 F.2d at pp. 596-597.) Party A would be subject to both a discovery order permitting disclosure of the documents and a preexisting agreement prohibiting their disclosure. To paraphrase *Hough* v. *Hough, supra,* 26 Cal.2d at page 611, instead of the devil of a contempt sanction, party A would face the deep blue sea of a collateral lawsuit.

In addition to interfering with the modification and enforcement of the trial court's order, allowing a breach of contract action to be based on the preceding agreement would permit a spiraling of litigation contrary to the established policy in this state that collateral disputes should be resolved in the underlying litigation. (See, e.g., *Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1197-1198 [17 Cal.Rptr.2d 828, 847 P.2d 1044]; *Pollock* v. *Superior Court, supra,* 229 Cal.App.3d at p. 29.) Parallel litigation would not only tie up additional judicial resources and possibly spawn *new* discovery disputes, it would also disrupt the underlying litigation by diverting the opposing party's

---

[5]"Presumably, due to its temporary nature, [and] its infringement upon the public right to know, . . . a sealing or confidentiality order in a civil case is always subject to continu[ed] review and modification, if not termination, upon changed circumstances." (*Mary R.* v. *B & R. Corp.* (1983) 149 Cal.App.3d 308, 317 [196 Cal.Rptr. 871].) See also *American Tel. & Tel. Co.* v. *Grady* (7th Cir. 1979) 594 F.2d 594, 597 (". . . exceptional considerations warranting the alteration of an agreed protective order exist in the present case.").

resources to defending the new, collateral lawsuit while leaving discovery in the underlying suit in a state of limbo until the collateral litigation was resolved.

Finally, there are important public policy reasons for placing decisions about information disclosure in the hands of the trial court rather than the parties, once litigation has commenced.

■ The state has two substantial interests in regulating pretrial discovery: one is to facilitate the search for truth and promote justice (*Hickman* v. *Taylor* (1947) 329 U.S. 495, 507 [91 L.Ed. 451, 460, 67 S.Ct. 385]); the other is to protect the legitimate privacy interests of the litigants and third parties. (*Seattle Times Co.* v. *Rhinehart* (1984) 467 U.S. 20, 34-35 [81 L.Ed.2d 17, 27-28, 104 S.Ct. 2199].) The interest in truth and justice is promoted by allowing liberal discovery of information in the possession of the opposing party. (*Id.* at p. 34.) The interest in privacy is promoted by restricting the procurement or dissemination of information from the opposing party upon a showing of "good cause" (Fed. Rules Civ.Proc. rule 26(c); Code Civ. Proc., § 2031, subd. (e)). (See generally, *Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 377 [15 Cal.Rptr. 90, 364 P.2d 266].) As we explain below, "[t]he trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery." (*Seattle Times Co.* v. *Rhinehart, supra,* 467 U.S. at p. 36 [81 L.Ed.2d at p. 29].)

Secrecy agreements and protective orders impair the public's access to discovery records as well as the parties' First Amendment right to disseminate information to the public. *(Seattle Times Co.* v. *Rhinehart, supra,* 467 U.S. at pp. 31-32 [81 L.Ed.2d at p. 26].)[6] Because the judicial process is frequently the avenue by which the public and regulatory agencies learn of significant health and safety hazards, blocking this avenue may prove detrimental to the public well-being. For this reason, courts frequently consider the public interest when determining whether good cause exists for a protective order. (See, e.g., *Brown & Williamson Tobacco Corp.* v. *F.T.C.* (6th Cir. 1983) 710 F.2d 1165, 1180 [unsealing documents because information relevant to public health]; and see discussion in Note, *Protective Orders in Products Liability Litigation: Striking the Proper Balance* (1991) 48 Wash. &

---

[6]Rule 5 of the Federal Rules of Civil Procedure provides that unless otherwise ordered all discovery documents shall be filed with the court. Although in California discovery documents are not filed with the court (see, e.g., Code Civ. Proc. § 2031, subd. (j) ), California imposes no confidentiality requirements with respect to information obtained through discovery except upon motion for good cause shown. (See, e.g., Code Civ. Proc., § 2031, subd. (e).) Thus, in the absence of an order obtained on a showing of good cause, nothing in California law would prohibit a party's sharing documents obtained through discovery with a nonparty.

Lee L.Rev. 1503, 1528.) The material disclosed in the SCE case, for example, dealt with problems Westinghouse was experiencing with steam generators used in its customers' nuclear power plants. The public obviously has a keen interest in the safety of nuclear power facilities. (*Duke Power Co. v. United States Nuclear Regulatory Com.* (4th Cir. 1985) 770 F.2d 386, 390.)

At the same time, a manufacturer such as Westinghouse has a legitimate interest in protecting its trade secrets and other confidential proprietary information. The relevancy and reliability of information obtained during discovery has not been subjected to judicial scrutiny and might never be disclosed at trial. Clearly, the release of inaccurate, unreliable or misleading information could unfairly damage the manufacturer's reputation and alarm the public unnecessarily. (*Seattle Times Co.* v. *Rhinehart, supra,* 467 U.S. at p. 35 [81 L.Ed.2d at p. 28.].) In the present case, for example, Westinghouse alleges that "wrenched from proper context," portions of the documents disclosed were susceptible of being misunderstood.

In *Seattle Times Co.* v. *Rhinehart, supra,* the court addressed the issue of whether a protective order restricting a party from disseminating information it obtained during discovery violated that party's First Amendment rights. After recognizing and discussing the interests of the restricted party and the public in disseminating the information and the interest of the party which produced the information in keeping it confidential, the court held "where, as in this case, a protective order is entered on a showing of good cause[,] is limited to the context of pretrial civil discovery, and does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment." (467 U.S. at p. 37 [81 L.Ed.2d at p. 29].)

The difference between a protective order issued by the trial court and a secrecy agreement between the parties is that the protective order *balances* the interests of the public, the plaintiff and the defendant by requiring the party seeking to restrict dissemination of discovered documents to demonstrate "good cause" for the restriction. In contrast, the private secrecy agreement is not based on notions of good cause or the public interest. It results from a negotiation between the parties in which the party possessing the information, by reason thereof, has considerable leverage over the party seeking disclosure and a strong economic incentive not to disclose information or to disclose as little as possible.[7]

For all of the reasons discussed above, we conclude Westinghouse cannot base a breach of contract action on either the federal court's protective order or the superseded secrecy agreement between the parties; nor can

[7]Our opinion should not be interpreted as condemning private nondisclosure agreements between parties attempting to negotiate the settlement of a dispute without resort to litigation. Public policy favors resolution of disputes outside of court. Obviously nondisclosure

the complaint be amended to state a cause of action. Therefore, the trial court acted correctly in sustaining a demurrer to the contract cause of action without leave to amend.[8]

### DISPOSITION

The judgment of dismissal is affirmed.

Lillie, P. J., and Woods (Fred), J., concurred.

A petition for a rehearing was denied November 22, 1995, and appellant's petition for review by the Supreme Court was denied February 15, 1996. Kennard, J., was of the opinion that the petition should be granted.

---

agreements may be necessary before the parties are willing to exchange information which can lead to a settlement of their dispute. All we are saying in this opinion is that once the dispute reaches the court, the disclosure and dissemination of information must be subject to court order, not the preexisting agreement of the parties.

[8]This does not necessarily mean Westinghouse is without a remedy for defendants' alleged violation of the protective order in the SCE action. In the dismissal order reviewed in *Westinghouse I*, the district court ruled the appropriate remedy was to "seek sanctions for such a violation in the underlying case," i.e., the SCE action. Nothing in the Ninth Circuit's opinion contradicts that ruling. Under facts very similar to those alleged by Westinghouse, the court in *Poliquin* v. *Garden Way, Inc.* (D.Me. 1994) 154 F.R.D. 29 ordered sanctions against the plaintiff's attorney for disclosing information and documents covered by a protective order to other counsel for use in a lawsuit against the same defendant. The sanction order was issued after the judgment in the case had become final.