[No. B127205. Second Dist., Div. Two. Apr. 30, 1999.]

JOSEPH STADISH et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
SOUTHERN CALIFORNIA GAS COMPANY, Real Party in Interest.

COUNSEL

Ian Herzog; Amy Ardell; and Evan D. Marshall for Petitioners.

No appearance for Respondent.

David Keitel; John McDowell; and Rey S. Yang for Real Party in Interest.

OPINION

MALLANO, J.*—Petitioners, Joseph and Lyn Stadish, seek a writ of mandate directing the superior court to set aside its order of October 29, 1998, in which it denied petitioners' motion to compel the production of certain documents, and granted real party Southern California Gas Company's motion for a protective order. We conclude that under the circumstances of this case, the court was permitted, under the authority of Code of Civil Procedure section 2031, subdivision (e),[1] to issue a protective order. However, we also conclude that the trial court failed to employ the proper procedure in making its rulings, and that as a result, the matter must be remanded for further proceedings.

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

## SUMMARY OF FACTS

Petitioners filed an eight-count complaint[2] against Southern California Gas Company (the Gas Company) alleging injuries from exposure to toxic chemicals while living in the vicinity of an underground, natural gas storage field owned by the Gas Company in the City of Playa del Rey. The Playa del Rey field originally housed oil and gas, which resided in its natural condition in the interstices of rock occupying certain strata beneath the surface of the earth. After the oil and gas deposits were withdrawn from the field, the Gas Company, in the mid-1940's, began using the depleted field by refilling the reservoir with natural gas obtained from other places. Petitioners claim that there have been hazardous vapor releases from the facility, gases vented to the atmosphere, and potentially dangerous migration of stored gas, and that as a result, members of the public have been physically and mentally injured.

On May 29, 1998, petitioner Lyn Stadish served the Gas Company with a request for production of documents, demanding production of 37 broad categories of documents.[3]

On June 13, 1998, counsel for the Gas Company, David Keitel, sought from petitioners' attorney, Amy Ardell, an extension of time within which to respond to several of the discovery requests and to establish a "workable timetable" for all responses.[4] Keitel proposed that The Gas Company's response to the production of documents be provided "by the end of June."

On June 19, 1998, Keitel advised that the Gas Company would serve responses by "the last half of July."

On July 7, 1998, Keitel expressed his continued concern about the "breadth and depth" of the document demand, and proposed a July 24, 1998, date for the Gas Company's response to the production of documents.

On July 24, 1998, Keitel advised that the Gas Company "had collected a substantial number of boxes of documents" responsive to petitioner Lyn

---

[2]The following causes of action were asserted: (1) private nuisance; (2) public nuisance causing special injury; (3) trespass; (4) assault and battery; (5) negligence; (6) strict liability for ultrahazardous activity; (7) intentional infliction of emotional distress; and (8) negligent infliction of emotional distress.

[3]The documents requested concerned, among other things, the operation of the Gas Company's gas storage facility, investigations of stored gas migration, venting of gases to the atmosphere, and hazardous vapor releases from the facility.

[4]As petitioners claim, Keitel did not specifically ask for an extension of time within which to object. However, Ardell did not, within her letters, advise Keitel that there would be any limitation on what he could set forth in his response.

Stadish's request for production of documents, and was ready to produce the documents. Ardell advised that she was going on vacation, and would be unable to review or copy any documents until the week of August 3, 1998.

Upon her return, Ardell suggested that the Gas Company produce documents on August 5, 1998. Keitel indicated that he was not available on that date. It was finally agreed that Ardell would review the documents on August 7, 1998.

On August 7, 1998, the Gas Company served a verified, written response to petitioner Lyn Stadish's request for production of documents. The Gas Company's response asserted various attorney-client and attorney work-product privileges, and objected to each "demand on the grounds that it is overbroad in scope and time frame, unduly burdensome, oppressive and harassing . . . to the extent that it seeks documents and requests information that are neither relevant to the subject matter of the pending litigation nor reasonably calculated to lead to the discovery of admissible evidence." The Gas Company promised to "produce and make available for inspection and copying all non-privileged, responsive documents currently in the possession, custody or control" of the Gas Company. The Gas Company made no mention of any trade secret privilege.

On the same day that the Gas Company served its response to petitioner Lyn Stadish's request for production of documents, it made available 40 boxes of documents containing approximately 50,000 pages of documents for Ardell to review. Keitel advised Ardell that there were, however, "some very isolated categories of documents that I cannot produce this morning, but expect to have within a matter of days."

On August 13, 1998, Ardell advised Keitel that although the Gas Company's response to petitioner Lyn Stadish's request for production of documents included objections based upon privilege, the Gas Company had failed to provide a privilege log.

Ardell and an associate, Bernard Endres, visited the Gas Company's offices and reviewed the documents produced in response to petitioner Lyn Stadish's request for production of documents. Endres spent approximately ten three- to six-hour days in pursuit of this task.

Following the inspection, Ardell selected for copying approximately one-half of the 50,000 pages of the documents which Keitel had made available, after which counsel discussed the most cost-effective method of duplicating this material. A privilege log was provided for a number of documents withheld on the bases of attorney-client privilege and attorney work-product.

On August 20, 1998, Ardell stated that she required further responses to petitioner Lyn Stadish's document demand because there were unspecified documents missing which she had "been unable to locate (either because [she] overlooked them or because they were overlooked in the production.)"

On August 20, 1998, petitioner Joseph Stadish served a separate request for production of documents. He demanded production of 21 categories of documents.

On August 28, 1998, Keitel inquired about Endres's role in petitioners' case. On August 31, 1998, Ardell replied that "Mr. Endres is not my designated representative/expert. He is an associate working with me in this matter."[5]

On September 9, 1998, Keitel agreed to provide Ardell with a two-week extension of time within which to file a motion to compel the production of further documents with regard to Lyn Stadish's document request.

On September 18, 1998, Ardell proposed, and Keitel agreed, that the Gas Company would make documents responsive to petitioner Lyn Stadish's document demand available for a second inspection on September 23, 1998. On September 23, 1998, Ardell designated which of the documents she wanted to have copied. Keitel agreed that Ardell could have the documents requested, and volunteered to copy the documents so they would be "Bates" stamped. Ardell reserved the right to copy at a later time other documents which had been produced.

On October 7, 1998, Ardell agreed to an October 14, 1998 date to review the "second round" of documents produced by the Gas Company.[6]

Sometime in early October 1998, Keitel informed Claus Langer, a manager at the Gas Company, that Bernard Endres had participated in reviewing documents for petitioners. Langer informed Keitel that Endres had been involved in actively campaigning and protesting against the "Playa Vista"

---

[5]Keitel claims that at the time he received Ardell's August 31, 1998, letter, other than what Ardell told him, Keitel did not know Endres's "true role" in the litigation. Keitel believed that Endres merely provided Ardell with legal advice and did not have a pecuniary, political or other personal interest in the case. Through independent research, Keitel was able to verify that Endres was in fact an attorney licensed to practice in California.

[6]The letters attached as exhibits to the motion to compel and to the Gas Company's opposition to the motion suggest that these were "new" documents, namely, documents Ardell had not yet reviewed.

development[7] at various times throughout the 1990's. Langer stated that Endres had worked as a consulting petroleum engineer for individuals and groups with varying political, environmental and economic interests which had protested against the Gas Company by accusing the Gas Company of destroying the environment. Keitel claims he discovered that Endres had his own economic interests in his consultant-for-hire capacity which were adverse to the Gas Company, and that Endres would improperly use information obtained during the course of this litigation against the Gas Company to further his own political agenda and economic interests, including the disclosure of trade secrets and other confidential proprietary information.

On October 9, 1998, Keitel advised Ardell that "[i]t has recently come to my attention that the documents you have selected raise significant concerns by the Gas Company about any use of these documents outside this litigation. Specifically, information has surfaced concerning the role of Bernard Endres in this litigation. Use of these documents (which constitute protectible trade secrets) outside this litigation would subject the Gas Company to a serious risk of adverse competitive intelligence. I would ask that these documents be produced under a standard protective order that would limit their use and dissemination to this lawsuit. I will forward a draft of a confidentiality agreement/protective order to you."

Keitel informed Ardell that the Gas Company would both fully produce further documents responsive to petitioner Lyn Stadish's request for production of documents, and allow Ardell to fully inspect further documents at the Playa del Rey facility in response to petitioner Joseph Stadish's request for production of documents, so long as Ardell signed a confidentiality agreement.[8] Keitel sent Ardell a proposed confidentiality agreement.

On October 14, 1998, Ardell objected to the proposed confidentiality agreement. She reminded Keitel that "[t]hese documents were requested and produced months ago and would already be in my possession if you had not insisted on doing the copying instead of letting my copy service do it." She

---

[7]The Gas Company claims that "[t]he Playa Vista development is a large scale, mixed use development proposed to be built near The Gas Company's facility. A number of individuals and groups with varying environmental, political and economic interests fought any required approvals for the project. Among the arguments made to defeat the development were that it would do damage to the natural environment and may not be safe due to its proximity to the storage facility. The Gas Company made occasional appearances at meetings and hearings to explain [that] its facility would pose no safety threat to the proposed development."

[8]According to Keitel, Ardell agreed to the proposal. Keitel makes this claim in a declaration filed in opposition to petitioners' motion to compel. However, the exhibit he references (a note faxed to Ardell) does not support the claim. The correspondence between Ardell and Keitel suggests that Ardell agreed to consider a confidentiality agreement, and that she finally decided not to sign one because it was—in her opinion—overbroad.

also stated, "You told me that you believe that all of the Gas Company's information is protected as a 'trade secret' including the way it does business, including how it communicates with the public, how it keeps its records, what substances are utilized in the injection, removal and transport of gas from the storage facility as well as what substances are vented into the neighborhood are all matters which I must agree to keep confidential and not discuss with anyone before you will produce any documentation whatsoever. [¶] I do not believe you have any legal authority for the position you are taking, either with regard to trade secrets, confidentiality or refusing to produce documents without Court Order." Ardell concluded, "In an effort to resolve this impasse, I have agreed to further discuss a modified confidentiality agreement with the Gas Company but, in return, I insist that all of the documents from the first production be provided to me."

On October 14, 1998, Keitel sent a modified confidentiality agreement. Ardell refused to sign the agreement.

On October 19, 1998, petitioners moved, ex parte, for an order shortening time to bring a motion to compel production of documents. At the hearing, Keitel advised the court that the Gas Company sought a protective order for the documents in dispute. The court informed Keitel that the Gas Company need not file a separate motion, and that the court would entertain the Gas Company's request for a protective order in its opposition papers.

On October 19, 1998, petitioners filed a motion to compel the Gas Company to produce the documents called for in petitioner Lyn Stadish's request for production of documents served on May 29, 1998, "which they previously agreed to produce and now will not," for an order compelling the Gas Company to provide verification that all documents requested by Lyn Stadish's request for production of documents served on May 29, 1998, had been identified and produced, for an order compelling the Gas Company to produce the documents called for in petitioner Joseph Stadish's request for production of documents served August 20, 1998, and for an order directing the Gas Company to provide verification that all the documents required by Joseph Stadish's request for production of documents had been identified and produced. On October 26, 1998, the Gas Company filed its opposition seeking a protective order from the court.

At the hearing on October 29, 1998, the trial court denied petitioners' motion to compel. The court determined that the Gas Company's responses to petitioner's document demand were timely, and that the Gas Company had made a prima facie showing of trade secret privilege, impliedly finding that the Gas Company had not waived its right to assert the trade secret privilege as a basis for its request for a protective order.

The trial court issued the following protective order: "1. In connection with discovery proceedings in this action, the parties may designate any document, thing, material, testimony, or other information derived therefrom as 'Confidential' under the terms of this Protective Order where such item of discovery contains trade secrets, competitively sensitive information, proprietary information concerning the operation of Defendants' business or other confidential information. [¶] 2. Material designated as Confidential under this order, the information contained therein, and any summaries, copies, abstracts, or other documents derived in whole or in part from material designated as Confidential (hereafter, collectively 'Confidential Material') shall be used only for the purposes of conducting this litigation, and for no other purpose. [¶] 3. Confidential Material produced pursuant to this order may be disclosed or made available by the receiving party to only the Court, counsel for a party and 'qualified persons' designated below: (a) a party, (b) experts or consultants retained by such party (or the party's counsel) to assist in the prosecution, defense, or settlement of this action; (c) court reporter(s) employed in this action; (d) a witness at any deposition or other proceeding in this action; and (e) any other person as to whom the parties in writing agree. [¶] 4. Prior to receiving any Confidential Material, each Qualified person . . . shall be provided with a copy of this Order and shall execute a nondisclosure agreement . . . a copy of such executed agreement shall be provided forthwith to counsel for each other party. Prior to receiving any Confidential Material, each 'Qualified person' . . . shall be provided with a copy of this order and shall be requested to execute a nondisclosure agreement . . . . [¶] 5. If Confidential Material is included in any papers to be filed in Court, such papers shall be labeled 'Confidential—Subject to Court Order' and lodged under seal with notice of lodging and S.A.S.E. [¶] 6. Should any party seek to use Confidential Material at trial, the parties shall confer prior to the trial date in an effort to agree upon a procedure to ensure the confidentiality of such information. In the event an agreement is not reached, the matter will be submitted to the Court to determine how best to assure the nondisclosure of such Confidential Material. The Court will retain jurisdiction to resolve any dispute regarding use of confidential material under this order. [¶] 7. Upon final termination of this action, including but not limited to the final adjudication of any appeals or petitions for extraordinary writs, all Confidential Material, including, inter alia, all copies thereof, all documents incorporating Confidential information, and all deposition transcripts designated Confidential, shall be delivered to counsel for the designating party, unless the parties otherwise agree in writing filed with this court."[9] This petition for writ of mandate followed.

---

[9]The trial court concluded that the protective order "does not limit or hinder the Stadishes' ability to present or use documentary evidence at trial."

### DISCUSSION

The trial court was presented with a motion to compel the production of documents, some of which had already been produced for inspection, and some of which, although requested, had not yet been produced.

### A. *Waiver*

#### 1. *Were the Gas Company's responses to petitioners' document demands timely filed?*

██ Section 2031, subdivision (k) provides that failure to respond to a section 2031 demand for the production of documents within the time permitted waives all objections to the demand.

With respect to Lyn Stadish's request for production of documents, the correspondence attached to the motion to compel indicates that counsel for petitioners (Ardell) and counsel for the Gas Company (Keitel) agreed to an extension of time within which the Gas Company's response to Lyn Stadish's document demand was to be filed, and that the Gas Company filed its response within the time agreed. We conclude, therefore, that the Gas Company did not waive the objections asserted within its response, namely, attorney-client privilege and attorney work-product privilege, to the document demand served on May 29, 1998, by petitioner Lyn Stadish.

With respect to Joseph Stadish's request for production of documents, there is no indication in the record that the Gas Company ever filed a response. During oral argument, counsel for the Gas Company asserted that it did not file a response to Joseph Stadish's document demand because none was due. In the absence of a finding by the trial court with respect to when the Gas Company's response to Joseph Stadish's document demand was due, we cannot determine whether the Gas Company waived its objections by failing to timely file a response to Joseph Stadish's request for production of documents. The trial court, upon being provided with additional information, will be required to make this determination.

#### 2. *Did the Gas Company waive its trade secret privilege by failing to assert the privilege in its responses to petitioners' requests for production of documents?*

██ Section 2031, subdivision (f)(3) provides that "If an objection [to a demand for the production of documents] is based on a claim of privilege,

the particular privilege invoked shall be stated." Evidence Code section 1060 recognizes the trade secret privilege.[10]

Because the Evidence Code recognizes the trade secret privilege, and because section 2031, subdivision (f)(3) requires a party responding to a request for production of documents to set forth in its response any privilege upon which the party relies, we conclude that the Gas Company was obligated to object in a timely fashion to the *production* of the documents on the basis of the trade secret privilege.

A review of the record reveals that the Gas Company did not assert the trade secret privilege in its response to petitioner Lyn Stadish's request for production of documents. The record also reveals that after the Gas Company filed its response, counsel for petitioners, Ardell, reviewed 40 boxes of documents, and the Gas Company agreed to copy documents she designated and deliver them to her. It was only after these events transpired that Ardell was informed that the Gas Company was claiming a trade secret privilege. We conclude that the Gas Company, as a matter of law, waived its right to assert the trade secret privilege as to the documents (including the 40 boxes of documents previously produced by the Gas Company) sought in petitioner Lyn Stadish's request for production of documents.

As to whether the Gas Company waived its right to assert the trade secret privilege in connection with the document demand served by Joseph Stadish on August 20, 1998, we cannot make such a determination because, as previously noted, the record does not reflect when the Gas Company's response was due.[11] On remand, the trial court will be required—after being provided with additional information—to make a determination as to whether a waiver occurred.

B. *Was petitioners' motion to compel properly denied?*

Petitioners sought to compel the Gas Company to produce the documents called for in petitioner Lyn Stadish's request for production of documents

---

[10]Evidence Code section 1061, subdivision (a)(1) provides: " 'Trade secret' means 'trade secret,' as defined in subdivision (d) of Section 3426.1 of the Civil Code, or paragraph (9) of subdivision (a) of Section 499c of the Penal Code." Penal Code section 499c, subdivision (a)(9) provides as follows: " 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] "(A) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Civil Code section 3426.1, subdivision (d), sets forth the identical definition.

[11]As previously noted, at oral argument counsel for the Gas Company indicated that the Gas Company did not file a response to the document demand served by Joseph Stadish because the response was not due. The trial court will be required to determine whether this statement is correct.

served on May 29, 1998, "which they previously agreed to produce and now will not," and for an order compelling the Gas Company to produce the documents called for in petitioner Joseph Stadish's request for production of documents served August 20, 1998. The trial court denied petitioners' motion to compel the production of documents and, at the same time, issued a protective order restricting the dissemination of the documents sought by petitioners in their motion to compel. As we have noted, the Gas Company produced 40 boxes of documents, and after petitioners' counsel inspected the documents, but prior to the time copies were to be delivered to her, the Gas Company asserted the trade secret privilege. We have determined that the Gas Company waived its right to assert the trade secret privilege with regard to the document demand served by Lyn Stadish. Accordingly, the trial court was required to grant petitioner Lyn Stadish's motion to compel. With respect to that portion of petitioners' motion seeking to compel the Gas Company to produce documents in response to petitioner Joseph Stadish's document demand, the court will be required, on remand, to make the necessary findings as to waiver, and then decide whether the motion should be granted.

## C. *Was the protective order properly granted?*

██ The Gas Company claims that the language of section 2031, subdivision (e) permitting a trial court to issue protective orders for good cause shown, authorized the trial court to issue such an order even though the Gas Company failed to assert the trade secret privilege in response to Lyn Stadish's document demand, and later produced for inspection most of the documents demanded. In support of its position, the Gas Company cites *Coalition Against Police Abuse* v. *Superior Court* (1985) 170 Cal.App.3d 888 [216 Cal.Rptr. 614], and *In re Marriage of Candiotti* (1995) 34 Cal.App.4th 718 [40 Cal.Rptr.2d 299].

In *Coalition Against Police Abuse* v. *Superior Court, supra,* 170 Cal.App.3d 888, the plaintiffs sued a city and a number of individuals and entities challenging a police department's use of undercover officers and agents to surveil and report on assertedly lawful political activities. In the course of the proceedings, the plaintiffs had obtained documents from the defendants through discovery. A large number of the documents were produced subject to protective orders which imposed restraints on the copying and use of the documents, and which permitted limited dissemination of certain of the discovered materials. (*Coalition Against Police Abuse* v. *Superior Court, supra,* 170 Cal.App.3d at p. 892.) Following entry of judgment pursuant to a settlement agreement, the trial court entered an order requiring that all of the documents described in the order which had been produced by

the defendants to the plaintiffs and subject to protective orders, be returned to the defendants, together with all copies of those documents. (*Id.* at p. 894.) The plaintiffs sought a writ of mandate to vacate the order. (*Id.* at p. 895.) The Court of Appeal directed the trial court to modify the order to provide that all original documents produced by the defendants were to be returned to them, and that the plaintiffs should be permitted to retain a copy of, and to disclose and disseminate, all documents or parts thereof which were disclosed or disseminated to the public, in accord with the terms of the protective orders or with the consent of the city, before the date of the return order. (*Id.* at p. 906.) The court held that a protective order entered on a showing of good cause, limited to the context of pretrial civil discovery, which does not restrict the dissemination of information gained from other sources, does not offend the First Amendment of the federal Constitution. (*Id.* at p. 899.) It further held that under the circumstances of the case, the trial court did not abuse its discretion in ordering the return of the documents. (*Id.* at p. 905.)

In *In re Marriage of Candiotti, supra,* 34 Cal.App.4th 718, a family law custody and visitation proceeding, the trial court issued a protective order restraining an ex-wife from disseminating information regarding the past driving record and other defined personal history of her ex-husband's present wife to anyone besides certain specified individuals. The order covered both information acquired during formal discovery and information independently obtained by the ex-wife. (*Id.* at pp. 719-720.) The Court of Appeal affirmed that part of the order banning dissemination of information obtained through discovery, and reversed that part of the order banning dissemination of independently acquired materials. Thus, only information obtained as a result of discovery could properly be made subject to a protective order. (*Id.* at p. 724.)

The 40 boxes of documents when produced for inspection by the Gas Company were not subject to a protective order. Petitioners did not, as did the plaintiffs in *Coalition* and the ex-wife in *Candiotti,* obtain documents and information pursuant to a court order imposing a protective order. Accordingly, *Coalition* and *Candiotti* are distinguishable.

The cases cited by the parties do not directly address the issue of whether a trial court has the authority to issue a protective order where, as here, the party seeking the order failed to assert the trade secret privilege in response to a document demand, and thereafter produced most of the documents for inspection. The answer, we believe, is found in section 2031, subdivision (e), which provides that a trial court "for good cause shown, may make any order that justice requires to protect any party from unwarranted . . . undue

burden and expense." The section specifically provides that the court may fashion an order "[t]hat a trade secret or other confidential research, development, or commercial information not be disclosed, or be disclosed only to specified persons or only in a specified way." (§ 2031, subd. (e)(5).) Although other subdivisions within section 2031 specify time limits with respect to certain matters, subdivision (e) contains no time limits within which an application for a protective order must be filed. We conclude, therefore, that upon a proper showing a party may—even after it has waived its right to object to the production of documents, and has produced most of the documents requested—seek a protective order restricting dissemination of the documents. Thus, the trial court correctly determined that the Gas Company had not waived its right to seek a protective order restricting dissemination of the documents previously produced in response to Lyn Stadish's document demand. ■ However, the trial court failed to employ the proper procedure in connection with the Gas Company's request for a protective order.

Here, the trial court delegated to the parties the responsibility of determining which items of discovery contained trade secrets. This was an impermissible delegation of authority.

Section 2031, subdivision (e) permits a court "for good cause shown" to "make any order that justice requires" that a trade secret "be disclosed only to specified persons or only in a specified way." (§ 2031, subd. (e)(5).) In order to determine whether good cause exists to restrict dissemination of documents which the Gas Company claims contain trade secrets, Evidence Code section 1061 should be followed.[12]

Evidence Code section 1060 provides that an owner of a trade secret has a privilege to refuse to disclose the secret. Evidence Code section 1061, subdivision (b)(1) requires that a party in a *criminal* action seeking a protective order submit an affidavit based on personal knowledge listing the

---

[12]Petitioners argue that Los Angeles Superior Court Rules, rule 7.19 (Court Rules Service (L.A. Daily J.)) should also be applied by the trial court. Local rule 7.19 is essentially an antisecrecy provision. It provides that "confidentiality agreements and protective orders are disfavored and should only be approved by the court when there is a genuine trade secret or privilege to be protected." It also provides that confidentiality agreements will not be approved by the trial court "absent a particularized showing (document by document) that: [¶] (a) Secrecy is in the public interest; and [¶] (b) The proponent has a cognizable interest in the material, i.e., the material contains trade secrets, privileged information, or is otherwise protected by law from disclosure; and [¶] (c) That disclosure would cause serious harm." This case does not concern a confidentiality agreement. It involves a request on the part of the Gas Company for a protective order to protect trade secrets. Accordingly, rule 7.19 is applicable only insofar as it requires that a "genuine" trade secret exist to be protected before a protective order is issued.

affiant's qualifications to give an opinion, identifying the alleged trade secret, identifying the documents disclosing the trade secret, and presenting evidence that the secret qualifies as a trade secret. Throughout these proceedings, the parties have conducted themselves as though section 1061 applies to this case. We conclude that the procedures called for in section 1061 have a utility in a civil action in protecting the trade secret privilege provided for in section 1060 and should be followed.[13] However, we note that the affidavits submitted by the Gas Company in this case are conclusory in nature and not in compliance with section 1061, subdivision (b)(1).

A party seeking the protective order must show by a preponderance of the evidence that the issuance of a protective order is proper. (Evid. Code, § 1061, subd. (b)(3).) Here, petitioners assert that the documents are relevant to public health. Where such a claim is made, the trial court is required to determine the validity of the claim. If the court decides that the documents sought to be protected are relevant to public health, the court will be required to consider the public interest in determining whether good cause exists for a protective order. Direction is found in *Westinghouse Electric Corp.* v. *Newman & Holtzinger* (1995) 39 Cal.App.4th 1194, 1208 [46 Cal.Rptr.2d 151] (*Westinghouse*).

The state has two substantial interests in regulating pretrial discovery. The first is to facilitate the search for truth and promote justice. The second is to protect the legitimate privacy interests of the litigants and third parties. (*Westinghouse, supra,* 39 Cal.App.4th at p. 1208.) "The interest in truth and justice is promoted by allowing liberal discovery of information in the possession of the opposing party. [Citation.] The interest in privacy is promoted by restricting the procurement or dissemination of information from the opposing party upon a showing of 'good cause.' [Citations.]" (*Ibid.*) The trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery. (*Ibid.*)

The *Westinghouse* court warned that protective orders "impair the public's access to discovery records as well as the parties' First Amendment right to disseminate information to the public." (*Westinghouse, supra,* 39 Cal.App.4th at p. 1208.) "Because the judicial process is frequently the avenue by which the public and regulatory agencies learn of significant health and safety hazards, blocking this avenue may prove detrimental to the public well-being. For this reason, courts frequently consider the public interest when determining whether good cause exists for a protective order. [Citations.]" (*Ibid.*)

---

[13]In *State Farm Fire & Casualty Co.* v. *Superior Court* (1997) 54 Cal.App.4th 625, 650-651 [62 Cal.Rptr.2d 834], the court applied Evidence Code section 1061 in a civil case without any discussion as to its applicability in noncriminal cases.

In *Westinghouse* the material sought concerned problems Westinghouse was experiencing with steam generators used in its customers' nuclear power plants. The *Westinghouse* court concluded that the "public obviously has a keen interest in the safety of nuclear power facilities." (*Westinghouse, supra,* 39 Cal.App.4th at p. 1209.) The *Westinghouse* court noted, however, that at the same time "a manufacturer such as Westinghouse has a legitimate interest in protecting its trade secrets and other confidential proprietary information." (*Ibid.*) The court emphasized that "[t]he relevancy and reliability of information obtained during discovery has not been subjected to judicial scrutiny and might never be disclosed at trial. Clearly, the release of inaccurate, unreliable or misleading information could unfairly damage the manufacturer's reputation and alarm the public unnecessarily. [Citation.]" (*Ibid.*)

 In the event the trial court determines that documents requested by petitioners contain trade secrets *and* are relevant to public health, the trial court must then, in compliance with *Westinghouse*, balance the interests of the public, the petitioners, and the Gas Company, and reach a decision as to whether dissemination of the documents should be restricted.

### DISPOSITION

Let a writ of mandate issue directing the superior court to set aside its order of October 29, 1998, in which it denied petitioners' motion to compel the production of documents, and granted real party in interest the Gas Company's request for a protective order, and to conduct further proceedings consistent with the views expressed herein. Petitioners shall recover their costs.

Nott, Acting P. J., concurred.

**ZEBROWSKI, J.,** Concurring.—Normally it is permissible to follow the case management order (CMO) procedures which have become common in complex litigation. CMO's are designed to streamline case processing, to control delay and expense, and to promote just results. A CMO often includes or incorporates a confidentiality order. Confidentiality orders often allow either side unilaterally to designate documents as confidential. Such unilateral designation subjects a designated document to whatever protections are provided by the confidentiality order. The instant case proceeded similarly to this common practice up to this point.

Missing from the instant case, however, are the "declassification" provisions commonly found in CMO's and related confidentiality orders. Confidentiality orders generally do allow initial unilateral classification as confidential, and hence do allow a document initially to be unilaterally subjected

to protection. For example, a typical CMO clause might provide that after classification as confidential, "the document and the information so classified shall be protected in accordance with this order until the court enters an order changing the classification," or similar language. However, such CMO's commonly also contain procedures for declassification. These procedures allow a party or intervener to apply for a ruling that a particular document or category of documents initially classified as confidential is not entitled to that protection. Notice and an opportunity to respond are provided, the burden is placed on the proponent of confidentiality to demonstrate good cause, a hearing follows and the court rules. (Cf. Fed. Jud. Center, Manual for Complex Litigation (3d ed. 1995) § 21.43, p. 65.)

In the instant case, there were no declassification provisions in the confidentiality order proposed by Southern California Gas Company. Although the trial court edited the proposed order, the trial court did not insert declassification provisions. In addition, the transcript of the hearing leading to the entry of the order suggests that the trial court did not intend to be further involved after unilateral classification. I agree that a court cannot delegate to a party the court's ultimate obligation to make decisions in this regard. However, if the trial court had included declassification provisions and had shown an intent to apply them, I would find this common CMO procedure proper and unobjectionable.

Los Angeles Superior Court Rules, rule 7.19 (Local Rule 7.19) (Court Rules Service (L.A. Daily J.)) does not change this conclusion. Local Rule 7.19 is ironically contained in chapter 7, "Trial Court Delay Reduction," although it can only reasonably be seen to promote the opposite effect. Notwithstanding that a state statute provides for protective orders, Local Rule 7.19 announces the policy of the Los Angeles Superior Court that "confidentiality agreements and protective orders are disfavored." It further provides that "[s]uch agreements *will not be recognized or approved by this court absent a particularized showing (document by document)* that: [¶] (a) Secrecy is in the public interest; and [¶] (b) The proponent has a cognizable interest in the material . . . or is otherwise protected by law from disclosure; and [¶] (c) That disclosure would cause serious harm." (Italics and underlining added.) Local rules such as this are enforceable so long as not in conflict with some higher law. (Cf. Code Civ. Proc., §§ 575.1, 575.2.)

Local Rule 7.19 seems to give inordinate weight to the values of open discovery, and little or no weight to the interests of cost control and judicial economy. The time which might be consumed by "a particularized showing (document by document)" regarding each of the thousands of documents which a party might seek to protect could almost certainly be spent more

productively on other judicial or legal business. Recognizing this, common CMO procedure focuses on those documents as to which a confidentiality classification is disputed. Nevertheless, as a general matter, a superior court is entitled to elevate a preference for open discovery above the value of cost control and judicial economy, to reject established procedures for the management of complex cases, and to replace them with idiosyncratic procedures such as the "particularized showing (document by document)" called for by Local Rule 7.19.

Nevertheless, if Local Rule 7.19 were interpreted to restrict the granting of a protective order even when needed, it might (as applied) conflict with Code of Civil Procedure 2031, subdivision (e). That section authorizes protective orders to protect a party or natural person from "undue burden and expense." To the extent that Local Rule 7.19 precluded a trial judge from protecting a party or natural person from "undue burden and expense" by requiring a "particularized showing (document by document)" even when the making of that showing would itself impose undue burden and expense, Local Rule 7.19 would be invalid as applied. However, although Local Rule 7.19 "disfavors" both confidentiality agreements and protective orders, it provides that only "[s]uch agreements" will not be recognized or approved without the "particularized showing (document by document)." The rule does not literally require "a particularized showing (document by document)" before the court can enter a protective order, as opposed to "recognizing or approving" an "agreement." Local Rule 7.19 thus appears literally to allow, although it may "disfavor," a standard CMO confidentiality provision which allows initial unilateral classification, followed by declassification procedures as needed. Courts handling complex litigation would be well advised to follow this tested CMO practice.

Most superior courts around the state will have no "particularized showing (document by document)" requirement, and hence will clearly be free to employ the procedures provided in typical CMO's used around the country as discussed above. (Cf., e.g., *Cipollone* v. *Liggett Group, Inc.* (3d Cir. 1986) 785 F.2d 1108, 1122 [document-by-document approach not mandated by federal rule].)

A petition for a rehearing was denied May 20, 1999.