Filed 1/14/14  P. v. Wahid CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056371 |
| v. | (Super.Ct.No. FCH1000232) |
| SAMIR MUSTAPHA WAHID, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Gerard S. Brown, Judge.  Affirmed.

Patrick Morgan Ford for Defendant and Respondent.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Samir Mustapha Wahid was convicted of the first degree murder of his estranged wife, with special circumstances. He contends that the trial court erroneously allowed the prosecutor to make use of defendant's failure to express remorse or otherwise inform the police that the killing was committed in the heat of passion and not premeditated, as he contended at trial. He also contends that the prosecutor committed a number of acts of prejudicial misconduct during cross-examination and closing argument.

We find no error, and we affirm the judgment.

PROCEDURAL HISTORY

On April 26, 2012, a jury found defendant guilty of first degree murder, with the special circumstances of financial gain and lying in wait. (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(1), (a)(15).) The jury also found it true that defendant personally used a dangerous or deadly weapon in the commission of the crime. (Pen. Code, § 12022, subd. (b)(1).)

The court sentenced defendant to life in prison without the possibility of parole, with one additional year for the weapon use enhancement. Defendant filed a timely notice of appeal.

FACTS

Defendant and his wife, Iman, were married in 1995. They had three children. The marriage was unsatisfactory because of defendant's inadequate sexual performance. Defendant felt inadequate as a husband and in general. Defendant owned an air conditioning company with his brothers and made a very good living. He showered his wife with expensive gifts in an effort to win her affection, including purchasing a hair

2

salon in 2008 for her to operate. Despite his efforts, the marriage continued to founder. Defendant closed the salon in 2009 because it was not making money, and was in fact draining him financially. One evening shortly after he closed the salon, Iman told him she was going to go out, that he was not her husband, and that she could "go out and fuck whoever she wants to fuck, and she's going to show [him] what a bitch can do." Defendant was shocked because they did not use that kind of language to each other.

The marriage deteriorated further, and in or about December 2009, defendant moved out of their house at Iman's request. He agreed to move out because he hoped that she might realize after he left that she needed him. He wanted the marriage to work, and he wanted to be loved. In January 2010, he had his attorney write a letter to Iman stating that he would give her $5,000 a month, less the mortgage payment, which he would pay directly. An effort at reconciliation in February 2010 failed, and on April 1, 2010, Iman filed for divorce and served defendant. On April 7, 2010, defendant signed a stipulation to pay Iman $8,000 a month in spousal and child support, again less the mortgage payment.

On May 23, 2010, Iman's attorney hired a forensic accountant to review their finances; defendant signed a stipulation to pay Iman $13,000 a month in child and spousal support, less the mortgage payment. He agreed to pay his attorney $10,000 and to deposit $50,000 into the trust accounts of his and Iman's attorneys.

Two days later, defendant borrowed a car from one of his employees. He did not say why he was borrowing it, but he had done so before to check up on some of his employees, to make sure they were not leaving work early. He drove to the family home

3

but parked at the end of the cul-de-sac. He went to see if Iman was home, but her car was not there. He sat in the borrowed car until she came home. When she arrived, he followed her into the house.

Around 1:30 p.m., neighbors heard screaming and saw Iman running down the street clutching her chest or her shoulder. They saw defendant walking after her with a knife in his hand. Defendant stood and watched her for a few seconds, then got into her Honda Pilot SUV and drove after her. A house painter working in the neighborhood heard screaming. He continued working, but heard the screams getting closer to him. He looked out the window and saw a woman running and screaming. He saw a Honda Pilot drive up and saw defendant get out. He saw them struggling or fighting, then saw a big knife in defendant's hand. He called 911. While he was on the phone, he saw defendant stabbing Iman. He stabbed her more than five times, maybe 15 to 20 times. While defendant was stabbing Iman, the witness heard him say, "I want you dead, bitch," "This is what you get for fucking around with your three other boyfriends," and "This is what I get for all this time being married to you." The witness also heard him say, "This is what you get for taking me to court and trying to take my kids and my money." Another witness testified that after the attack, defendant said, "She was an f'ing whore, and she was cheating on me with two guys." When defendant inflicted the final stab wound, he used both hands and "pushed [the knife] and made sure it went into the body."

When sheriff's deputies arrived, defendant said, "I'm her husband. I did it. I stabbed that bitch. I hope she dies." He also said, "Don't help that bitch. Let her die. She doesn't need any help" and "I know I did it. Arrest me. She has been cheating on

4

me with two men. I hope she is dead." When the officer asked if defendant was okay, he said, "No, but is my bitch wife dead yet?"

The deputies handcuffed defendant and put him into a patrol car and activated a recording device before transporting him to the sheriff's station. While being transported, defendant said, "That's what happens when someone gets too greedy," and talked about Iman's financial demands. After they arrived at the station, he said, "She bleeds, I didn't know she was human." Defendant told police about Iman's extravagant spending, about the dissolution proceedings and Iman's monetary demands. He complained that he was a hard worker and "I get the bitch that kicked me out who's never held a job before in her life." He also said that the children would be better off without Iman because she was not raising them properly. When deputies were about to read him his *Miranda*[1] rights, he said, "[O]bviously, . . . I did murder my wife, there's no ifs ands or buts about that" and "Casper the friendly ghost didn't kill her, I did."

Deputies recovered defendant's wallet from a nearby golf course. At the time of his arrest, defendant had only the house key and cash in his pockets.

Iman suffered approximately 25 different wounds, including about six superficial wounds and 17 stab wounds. One wound went through Iman's chest and lung and into a vertebra. The tip of the knife broke off and was embedded into the vertebra. The knife was removed from the body during the autopsy with the tip broken off. Iman died of multiple stab wounds to the neck, chest and abdomen.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

5

Defendant admitted having killed Iman but sought a conviction for heat-of-passion voluntary manslaughter rather than murder. He testified that on the day of the homicide, he wanted to try one more time to reconcile, and that he had used a car Iman would not recognize because he did not want to embarrass himself if Iman was entertaining a male friend. He told her he wanted to reconcile, but she said there was nothing to talk about. She said, "I'm not your wife. This is not your house. These are not your kids. It's just a matter of time before they forg[e]t about you." She also said she had found someone else who could take care of her and who could satisfy her sexually. Defendant said he became enraged, grabbed a knife off the drain board and went after her, intending to kill her. However, when he stabbed Iman, he did not want her to die; he just wanted her to feel what he was feeling. He only realized he had killed her when he was lying on the curb after the attack.

DISCUSSION

1.

NO *DOYLE* ERROR OCCURRED

Defendant presents an argument which he has captioned, "The prosecutor committed *Doyle* error by arguing that the jury should consider the many things [defendant] failed to tell police after his arrest." Despite the caption, however, defendant's actual assertion is different.

In *Doyle v. Ohio* (1976) 426 U.S. 610, the United States Supreme Court held that if a defendant has been advised of his constitutional right to remain silent, a prosecutor may not use the defendant's subsequent silence to impeach his exculpatory testimony at

6

trial. (*Id.* at p. 619.) The court's ruling that doing so would violate the defendant's due process rights was based in part on the recognition that it would be unfair to allow the defendant to be impeached by his silence after having received an implicit assurance that a refusal to speak to police could not be held against him. (*Id*. at pp. 614-618.) In *Fletcher v. Weir* (1982) 455 U.S. 603, the court held that a defendant's testimony may, however, be impeached with post-arrest, pre-*Miranda* silence: "In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to post-arrest silence when a defendant chooses to take the stand." (*Fletcher v. Weir*, at p. 607.) Although California courts at one time forbade cross-examination or comment on a defendant's post-arrest silence whether *Miranda* warnings were given or not, after the passage of Proposition 8 in 1982, California law conformed to federal law in that respect. (*People v. Delgado* (1992) 10 Cal.App.4th 1837, 1841-1842 [Fourth Dist., Div. Two].) Accordingly, it is "clear that where *Miranda* warnings have not been given, the federal rule, as announced in *Fletcher v. Weir*, governs, and *Doyle* error is not committed by questions or commentary concerning a defendant's post-arrest silence." (*Id.* at p. 1842.)

In this case, defense counsel objected during oral argument to the prosecutor's comments on things defendant failed to say to law enforcement after the attack on Iman—statements which might have been expected if defendant had not premeditated murdering her but instead reacted in the heat of passion when she rejected his reconciliation overtures, as defendant testified. However, defendant's objection was not that the prosecutor was improperly arguing that defendant's testimony was impeached by

7

his failure to explain his conduct to law enforcement, but rather that the prosecutor was using defendant's failure to make statements to law enforcement which were consistent with his manslaughter defense as affirmative evidence of defendant's guilt of premeditated murder. It was undisputed, moreover, that both the statements and the silences the prosecutor referred to in his argument as supporting guilt of premeditated murder occurred before defendant was given a *Miranda* warning. Accordingly, it is clear that no *Doyle* error occurred. (*People v. Delgado*, *supra*, 10 Cal.App.4th at pp. 1841-1842.)

In any event, despite the caption, defendant does not assert that *Doyle* error occurred. Rather, consistent with his objection below, defendant argues that the prosecutor improperly used defendant's post-arrest, non-*Mirandized* silence as affirmative evidence of guilt.[2] However, the trial court ruled in defendant's favor on that issue. After the trial court ruled that a non-*Mirandized* defendant's failure to offer exculpatory statements may be used only to impeach the defendant's trial testimony, defendant reiterated his objection that rather than impeaching defendant's testimony, the prosecutor had used it as affirmative evidence of defendant's guilt when he asserted that "because the defendant while in custody and un-*Mirandized* didn't say, this, this, this, and this, he therefore must be guilty." The court agreed that such an argument is improper and admonished the prosecutor to limit his comments to the impeachment effect

---

[2] Whether a defendant's post-arrest, pre-*Miranda* silence may be used as affirmative evidence of guilt in the prosecution's case-in-chief is currently on review in *People v. Tom* (2012) 204 Cal.App.4th 480, review granted June 20, 2012, S202107.

of defendant's silence on the points the prosecutor asserted he should have told to law enforcement. Because the court ruled in defendant's favor, the contention is moot.

Defendant also asserts that statements he did make, such as his repeated assertions that Iman was trying to take his money, "which were such a large part of the prosecutor's closing argument, did not impeach the things [defendant] discussed in his testimony." However, defendant did not object below to the prosecutor's comments on statements defendant did make; he objected only to the prosecutor's comments on defendant's failure to make certain statements. Errors not asserted in the trial court may generally not be raised on appeal. (*In re Aaron B.* (1996) 46 Cal.App.4th 843, 846.) Because defendant did not object below, he has not preserved the issue for appeal.

2.

NO PREJUDICE RESULTED FROM ANY PROSECUTORIAL MISCONDUCT

Defendant contends the prosecutor committed misconduct by invading the attorney-client privilege, by informing jurors the punishment for voluntary manslaughter was less than that for murder, and by "testifying" during cross-examination that defendant murdered his wife.

*Background.*

During cross-examination, the prosecutor asked defendant why he changed his testimony and insisted he did not intend to kill his wife despite having said only moments before that he did intend to kill her. Defendant responded that he changed his testimony because the prosecutor put pressure on him. The prosecutor responded, "I hope you feel a lot of pressure. You murdered your wife." Defense counsel objected that the question

9

was argumentative. The court said, "Okay. Ask another question." Defense counsel did not request an admonition to the jury to disregard the prosecutor's assertion that the crime was murder rather than manslaughter.

Later, on recross-examination, the prosecutor asked defendant what he did to prepare for his testimony. Defense counsel asked to address the court at side bar. The court said this was a typical question on cross-examination, but advised defendant that "you're not to in any way reveal any conversations you have had with your lawyers or any documents you might have gone over with your lawyers. Other than that, due to the privilege, I'll let you go ahead and answer the question."

Defendant asked the prosecution to repeat the question. The prosecutor asked, "Other than any interaction you had with your lawyers or any documents your attorneys may have shown you, what did you do to prepare for your testimony in this case?" Defendant replied, "Nothing."

The prosecutor then asked defendant if he realized that his testimony was important. He asked defendant whether he realized that, if the jury found him guilty of voluntary manslaughter, his punishment would be significantly reduced. The court told the prosecutor to stop and informed the jury it was not to consider punishment. The prosecutor then asked defendant if he knew that if the jury believed him, it could significantly benefit him. The court raised its own objection, and told the jurors that "[i]n your deliberations, you are not to consider punishment in any way, shape or form."

At the end of defendant's testimony, defense counsel made a motion for a mistrial, claiming that the prosecutor's questions about his knowledge of the law of manslaughter

10

had compromised defendant's due process rights. The prosecutor informed the court that his intention was not to have the jurors consider defendant's punishment, but instead to encourage them to consider his credibility and his state of mind. The prosecutor explained, "I certainly wasn't trying to violate his Constitutional rights. I wasn't trying to commit malpractice. I was trying to get to the defendant's motives to lie." According to the prosecutor, defendant could have discovered that he would receive a lighter sentence for voluntary manslaughter than for murder by speaking with lawyers in his family or by accessing books while in prison and prepared his testimony accordingly.

With respect to the prosecutor's alleged invasion of the attorney-client privilege, the court said there was no concern because defendant did not reveal anything that "could have been a problem," as he merely stated that he did nothing to prepare for giving his testimony. The court was troubled by the prosecutor's asking defendant if he knew he could get a reduced punishment for voluntary manslaughter. However, the court noted that the prosecutor's intent in asking the question—to evaluate defendant's credibility— was not inappropriate or impermissible as "[i]t's the jury's job to decide whether you're telling the truth or not." The court noted that it had admonished the jurors not to consider penalty or punishment, and stated that defense counsel had already asked the jurors to reject first degree murder and the special circumstances and find defendant guilty of voluntary manslaughter. Thus, the prosecutor did not ask any questions or provide any information that might "surprise" the jury. The court concluded that, looking at the totality of the alleged misconduct, "I do not believe that [defendant's] due process rights have been violated after the admonition and the new questions were asked . . . . [¶] I do

11

have to say I'm disappointed, but I don't think these rise to the level of declaring a mistrial in this case. Accordingly, the court denied defendant's motion for a mistrial.

*Applicable Law.*

The applicable federal and state standards regarding prosecutorial misconduct are well established: "'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.]'" (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214-1215.) In such a case, the court applies the *Chapman* harmless beyond a reasonable doubt standard. (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1323, citing *Chapman v. California* (1967) 386 U.S. 18.) "'[C]onduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'the use of deceptive or reprehensible methods to attempt to persuade either the court or jury.'"'" (*People v. Gionis*, at p. 1215.) Under state law, a defendant's conviction will not be reversed for prosecutorial misconduct absent a showing that it is reasonably probable that the jury would have reached a result more favorable to the defendant had the misconduct not occurred. (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 243 [Fourth Dist., Div. Two]; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Even where the prosecutor acts improperly, a timely admonition from the court generally cures any harm. (*People v. Pigage* (2003) 112 Cal.App.4th 1359, 1375.)

12

*Analysis.*

We agree with the trial court's analysis. First, with respect to the contention that the prosecutor violated defendant's attorney-client privilege, the court correctly held that the privilege had not been breached because defendant did not reveal any confidential communications. The mere fact that communications took place between an attorney and client is not privileged. (*State Farm Fire & Casualty Co. v. Superior Court* (1997) 54 Cal.App.4th 625, 640.) The prosecutor's questions did not go further, and defendant did not reveal any privileged communications. Consequently, even if the prosecutor's question was an attempt to violate defendant's attorney-client privilege, he did not succeed in doing so.

Next, even if it was misconduct for the prosecutor to ask questions concerning defendant's knowledge that manslaughter carries a lesser penalty than first degree murder, any error was harmless under either the *Chapman* standard or the *Watson* standard. First, it is common knowledge that manslaughter is a less serious offense than murder. Second, defense counsel, in his opening statement, had apparently asked the jury to find defendant guilty of manslaughter rather than first degree murder. That request would have made it obvious to any person of normal intelligence who did not already know that manslaughter is a less serious offense than murder that a manslaughter conviction was a more desirable outcome from defendant's point of view. Finally, the court instructed the jury that it could not consider punishment "in any way, shape or form" in its deliberations.

13

Jurors are presumed to have followed the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Defendant has not pointed to anything in the record which would overcome that presumption. The cases he relies upon are inapposite. In *People v. Shazier* (2012) 212 Cal.App.4th 520, for example, the prosecutor engaged in a "pervasive pattern of inappropriate questions, comments and argument," and the trial court did not sustain any of the defendant's well-taken objections. (*Id.* at 537.) The court noted that egregious misconduct is generally reversible when it is not corrected by the trial court. (*Ibid.*, citing *People v. Hill* (1998) 17 Cal.4th 800, 853 (conc. opn. of George, C. J.).) Here, in contrast, the court acted promptly, without waiting for an objection by the defense, and took appropriate remedial action.[3]

Finally, with respect to defendant's contention that the prosecutor improperly "testified" when he asserted, in response to defendant's answer to a question, that defendant had murdered his wife, the court sustained defendant's objection that the comment was argumentative. Defense counsel did not ask for any additional curative action, such as an admonition to the jury that it was their function, not the prosecutor's, to determine what crime had been committed.

A defendant who fails to request curative action in response to prosecutorial misconduct waives a claim of prosecutorial misconduct on appeal unless an admonition would not have cured the harm caused by the misconduct. (*People v. Hill*, *supra*, 17

---

[3] Review was granted in *People v. Shazier*, *supra*, 212 Cal.App.4th 520, after defendant's opening brief was filed, and it is no longer citable as authority. (*People v. Shazier*, review granted Apr. 17, 2013, S208398.) We discuss it only to illustrate the fallacy in defendant's argument.

14

Cal.4th at p. 820.) Defendant does not contend that an admonition would not have cured any harm in this instance. In any event, the omission of an admonition was not prejudicial. It could hardly have come as a surprise to the jury that the prosecutor believed defendant was guilty of murder rather than manslaughter. Opening arguments are not part of the record on appeal. However, we assume that the prosecutor made it clear in his opening statement that he was seeking a conviction of murder with special circumstances. Even if the prosecutor did not make that clear in his opening statement, however, the record reflects that defense counsel did tell the jury in his opening statement that he believed defendant was guilty of voluntary manslaughter rather than murder. Moreover, the jury was instructed at the beginning of the trial that the attorneys' questions and comments are not evidence and that it was their function to determine the facts. That instruction was repeated at the close of evidence. We have no reason to believe that the jury did not follow that instruction. (*People v. Sanchez*, *supra*, 26 Cal.4th at p. 852.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER _____

J.

We concur:

HOLLENHORST _____

Acting P. J.

MILLER _____

J.